No. 3–08–0547
Consolidated with No. 3-08-0548

Filed November 26, 2008

IN THE

APPELLATE COURT OF ILLINOIS

THIRD JUDICIAL DISTRICT

A.D., 2008

| | | |
|---|---|---|
| *In re* B.B. and A.T., | ) | Appeal from the Circuit Court |
| | ) | of the10th Judicial Circuit, |
| Minors | ) | Peoria County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 05 JA 276 and 05 JA 277 |
| | ) | |
| v. | ) | |
| | ) | |
| Quinn T., | ) | Honorable |
| | ) | Chris L. Fredericksen, |
| Respondent-Appellant) | ) | Judge Presiding. |

JUSTICE WRIGHT delivered the opinion of the court:

Quinn T. is the mother of the minor children, B.B. and A.T. On February 14, 2006, the trial court found the minors, B.B. and A.T., neglected and entered an order adjudicating the minors wards of the court. The State filed petitions for termination of parental rights against the mother on behalf of each of the minor children. After finding the mother unfit as alleged in the petitions to terminate mother's parental rights, the trial court conducted a best interest hearing on July 7, 2008. The court found it was in the best interest of both minor children to terminate the mother's parental rights. Mother filed a timely notice of appeal, and the two juvenile proceedings

were consolidated on appeal. We reverse and remand with directions.

FACTS

Quinn T. gave birth to B.B. on November 14, 2005, at OSF St. Francis Medical Center, Peoria, Illinois. At birth, B.B.'s blood tested positive for the presence of cocaine. Consequently, on November 21, 2005, the State filed a juvenile petition in Peoria County case No. 05 JA 276 alleging B.B. was neglected because the newborn's blood tested positive for the presence of cocaine, and the minor's environment was injurious to his welfare. The petition alleged that Bo W. was the father of B.B.

On the same date, the State filed a juvenile petition in Peoria County case No. 05 JA 277 alleging that B.B.'s sibling, A.T., was neglected because the minor's environment was also injurious to her welfare. The petition alleged that A.T.'s date of birth was May 22, 2003. The State's petition named Andrew L. as A.T.'s father and named Quinn T. as A.T's mother. The trial court appointed Floyd Dailey as guardian *ad litem* for the minor children on November 22, 2005. The trial court entered an order for temporary shelter care in both cases on November 22, 2005, placing the minors in the temporary custody of Department of Children and Family Services (DCFS).

Mother failed to answer the petition alleging both children were neglected and subject to an injurious environment. On February 14, 2006, mother failed to appear at the adjudicatory hearing. The court entered adjudication orders by default finding the minors neglected. On that same date, the trial court entered dispositional orders finding that it was in the best interest of the children to make them wards of the court. The court further found that mother was dispositionally unfit to care for, protect, train, or discipline the minors based on the following

2

factors: (1) minor B.B. was positive for cocaine at birth; (2) mother's drug use; (3) domestic violence against mother while pregnant with B.B. and in the presence of A.T.; and (4) mother's lack of "participation" while juvenile petition was pending.

In her absence, the judge ordered mother to complete various tasks, including cooperate with DCFS, comply with terms of the service plans, and correct the conditions that required removal of the child or risk termination of parental rights. The trial court also ordered DCFS to determine the times and location for supervised visits between mother and the minor children. The trial court scheduled permanency review hearings in both cases for July11, 2006.

The social services caseworker filed respective permanency review hearing reports with the court on July 11, 2006, recommending that DCFS maintain guardianship of the minors and requiring mother to complete the previously ordered tasks. In the reports, the social services caseworker scheduled visits between mother and children for one hour per week at either the agency office or out in the community. Mother advised the caseworker that she could not come to the agency office because she feared that she would go to jail because the police would be able to find her at that location. In April 2006, DCFS discontinued supervised visitation due to mother's failure to attend the visits. According to the report submitted to the court on July 11, 2006, mother visited the children once a month at the original foster parent's residence. The report recommended that permanency goal was return home pending status, as mother did not seem to be willing to cooperate with DCFS.

Mother failed to appear at the next permanency review hearing on December 19, 2006. The social services caseworker filed permanency review hearing reports on December 19, 2006. According to the December 19, 2006, report, mother refused to coordinate visits between the

3

caseworker and the minor children but was regularly visiting the children on a *weekly* basis at the foster parent's residence since October 2006. At a case review, the agency advised the foster parent to restrict visits to only once a week because the juvenile case was proceeding toward termination. On December 19, 2006, the trial court entered permanency review orders in both cases finding that the original permanency goal of return home had not been achieved. The court adopted the new permanency goal recommendation for substitute care. The court allowed mother's attorney to withdraw on December 19, 2006, because mother had not appeared at any court ordered hearings since the shelter care hearing on November 22, 2005. The next scheduled permanency review was set for June 12, 2007.

Four days before the scheduled hearing, DCFS and the State requested the juvenile judge issue protective juvenile warrants alleging that mother and the children's foster mother both removed the children from the care of DCFS. On June 8, 2007, the whereabouts of the children were unknown to DCFS caseworkers. The court issued the warrants, but the juvenile court proceedings progressed in the absence of the children, foster mother, and mother.

The social services caseworker filed a June permanency review report and addendum. According to the report, the foster mother advised the caseworker that mother visited the children "occasionally" at the foster residence. The report indicated that mother contacted the caseworker on May 29, 2007, to schedule a visit through the social services caseworker due to the fact that mother could not visit the children anymore at the foster mother's residence. DCFS planned to place the children elsewhere as a result of a foster placement review in May 2007. Thereafter on May 31, 2007, mother cancelled the visit, but on that same day, the social services caseworker found mother at the foster mother's residence when she made an unannounced visit to the

4

residence.

On June 12, 2007, the trial court entered permanency review orders that adopted the social service agency's permanency goal recommendation for substitute care. The trial court found mother failed to make reasonable efforts to achieve the requirements of the service plan "*even before*" (emphasis added) she disappeared with her children and their foster mother. The trial court reserved ruling on the issue of whether DCFS made reasonable efforts to achieve the permanency goal of substitute care and the corresponding service plan.

The trial court ordered DCFS to prepare a written report and appear to explain its decision to allow mother to designate the foster mother in question and its decision to thwart Counseling and Family Services' attempts to remove the children from the foster mother in May of 2007. The court scheduled a hearing on these issues for August 8, 2007.

In the interim, the State filed petitions for termination of parental rights as to each minor on July 27, 2007. According to court documents, the whereabouts of both mother and the children remained unknown when the State filed the first termination petition. Count I alleged that mother was an unfit person as defined in section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2006)) in that she had failed to maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare.

On August 7, 2007, the trial court conducted a hearing with DCFS to address the court's concerns. A transcript of this hearing is not part of the record on appeal. In its written report, DCFS acknowledged that Counseling and Family Services (Family Services) requested DCFS to remove the children from the original foster home in late May 2007. The Family Services caseworker personally found mother present at the foster parent's residence, after receiving

information from the police that mother was located at the residence. According to the police report, officers found mother at the foster mother's residence coming out of the shower, and officers stated that it appeared mother was living there. When the caseworker arrived at the foster mother's residence, the caseworker found A.T. playing outside. A.T. told the caseworker that her mother was there and called to her mother.

In May of 2007, A.T. described an instance to the caseworker when the child was fearful, and she touched her mother's foot in bed, finding assurance and relieving her fear. The caseworker also learned that mother listed the foster home address as her own personal home address on her application for assistance with the Department of Human Services. Further, the caseworker discovered that mother was pregnant with her third child and claimed that the child belonged to B.B.'s deceased father. Based on mother's statements, the Family Services caseworker concluded mother was indeed eight months pregnant.

The report prepared for the judge's consideration as evidence that DCFS used reasonable efforts indicated that during the initial investigation and foster placement review, DCFS did not find any direct evidence that mother was living with the foster parent and the children. Therefore, the DCFS caseworker did not have any immediate or urgent safety concerns surrounding its decision to allow A.T. and B.B. to temporarily remain with the original foster mother. Further, the caseworker explained in the report that DCFS had not implemented a structured visitation schedule with mother and the foster parent could allow mother to visit the children.

However, the reports also indicated DCFS ultimately concluded that the children should be placed in a new foster home. Further, DCFS directed Family Services to conduct three

6

unannounced visits per week to verify that mother was not at the residence. DCFS also directed the social service agency to immediately remove the children if mother was found at the residence. DCFS sent notification to the foster mother that the children would be removed from the residence. The foster mother appealed the requested removal of the children from her care. Shortly thereafter, mother, the foster mother and the minor children left the State of Illinois. Following the hearing, the trial court determined that DCFS made reasonable efforts toward achievement of the permanency goal of substitute care and the associated service plan.

The court held a termination of parental rights hearing on September 5, 2007, in the mother and children's absence. At that time, Count I of the petitions to terminate parental rights alleged that mother was an unfit person as defined in section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2006)) in that she had failed to maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare. Mother failed to appear for the termination hearing. The appellate record does not contain a transcript of proceedings from September 5, 2007. On that date, the court entered a default judgment. The order stated that mother received notice of the hearing by publication and failed to appear. The court continued the matter to October 24, 2007, for entry of order and a best interest hearing.

Seven days later, on September 12, 2007, the State notified the trial court that the protective warrants relating to A.T. and B.B., along with a third protective warrant for A.T. and B.B.'s sibling, Tomy, had been served in Florida. According to the contents of the social services caseworker's permanency review report dated November 27, 2007, Florida Child Welfare Services located the minor children in Putnam County, Florida, on September 7, 2007, two days after the termination hearing in Illinois.

Illinois social service representatives traveled to Florida and returned the children to the State of Illinois on September 10, 2007. The social service caseworker's report dated November 27, 2007, described the condition of the children when the Florida Child Welfare Services located the two children. According to the report, the children were covered with scabbed and oozing bumps believed to be flea bites.

In a conversation with the Illinois Counseling and Family Services caseworker, mother revealed her plan to avoid required services in Illinois because she wanted the original foster mother, whom she described as the children's godmother, to adopt the children. Once the children were adopted, mother planned to move away with both the children and the adoptive foster mother so that mother could raise the children without State intervention.

According to the same report dated November 27, 2007, mother also stated that three days after arriving in Florida, she gave birth to a child she named Tomy. Mother used a false name at the hospital. Mother tested positive for marijuana at the time of Tomy's birth, and the hospital called Florida child services. However, according to the mother, child services in Florida did not take the minor into custody. Mother acknowledged to the caseworker that she moved the children from home to home while in Florida. Mother indicated that she decided to return to Illinois to visit her family and left the children with the foster mother in Florida.

While in Illinois, mother learned that Florida social services contacted family members in Florida looking for the children. In response, mother contacted the foster mother, who remained in Florida with the children, and instructed her to take the children to a new location. Further, mother admitted to the social services caseworker that she saw her children on a daily basis when they were in foster care in Illinois, beginning in August 2006, and that she stayed with the

8

children on a regular basis after October 2006.

On October 1, 2007, mother appeared in open court for the first time since November 22, 2005. The trial judge vacated the default order regarding fitness for failing to maintain a reasonable degree of interest, concern or responsibility as to the minors' welfare. After vacating the default order, the judge continued the cause to October 22, 2007, for an appearance on mother's answer to the July 2007 petition to terminate parental rights. The trial court appointed Louis Milot as counsel to act on behalf of mother. The trial court also appointed and named Louise Natonek as guardian *ad litem* for the minor children.

Thereafter, on October 3, 2007, the State filed supplemental petitions for termination of parental rights which alleged that mother failed to make reasonable progress toward the return of the minors during any nine-month period after the end of the initial nine-month period following the adjudication of neglect, being November 14, 2006, to August 14, 2007, in violation of section 1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West 2006)). Mother filed written answers to the supplemental petitions to terminate parental rights on October 22, 2007. Again, the trial court appointed Louise Natonek as guardian *ad litem* for the minor children. The court set a trial on the petitions to terminate mother's parental rights for April 16, 2008.

The social services caseworker filed permanency review hearing reports with the court on December 11, 2007. The social service caseworker's permanency hearing review report filed December 11, 2007, stated that B.B. experienced behavioral issues upon his return from Florida and that B.B. had a lot of trouble adjusting to his new placement. B.B. acted out with tantrums and screaming fits, and banging his head on the floor. B.B. constantly wanted to eat food. Over time, B.B.'s behavior dramatically improved. The report stated that A.T. also experienced

9

behavioral problems when she returned to Illinois. According to the report, foster parents observed A.T. grabbing household items and carrying out drug-related behavior consistent with the motion necessary to roll cannabis joints. Further, the report stated that A.T. began acting out in the new foster home. A.T. was bonded to her mother and was used to being with her mother and seeing her mother on a regular basis. The report indicated the following: "It will take a long time for [A.T.'s]*** behavior to adjust to a structured environment and she may always need therapy to deal with issues of loss and abandonment."

The trial court conducted a permanency review hearing and entered a permanency review order regarding both minor children on December 11, 2007. Attorney Floyd Dailey appeared as guardian *ad litem* for the minor children. The appellate record does not include a transcript of these proceedings. The printed, written order found that mother had not participated in services, was living with the minors in secret, and fled with the minors to the State of Florida. The court maintained the permanency goal of substitute care pending the court's decision with regard to termination.

On April 16, 2008, the trial court conducted a hearing on the petitions for termination of mother's parental rights. The State voluntarily dismissed count I of the petitions to terminate parental rights. At this time, Nicholas Owens, assistant public defender, appeared as guardian *ad litem* for children on April 16, 2008. At the conclusion of the evidence, the trial court stated that mother did not complete services when the goal was return home, and mother did not complete any services after the goal was changed to substitute care. The court noted that mother had little contact, if any, with the children's caseworker for a substantial period of time. The court further found she did not cooperate with DCFS and she did not make progress toward reunification with

10

regard to either of the minors. Therefore, the trial court found mother unfit as alleged in count III of the petitions to terminate parental rights.

Count II of B.B.'s petition alleged that putative father, Bo W., was now deceased. Count II of A.T.'s petition alleged that putative father, Andrew L., failed to maintain a reasonable degree of interest, concern or responsibility as to the minor's welfare. The trial court entered written orders finding that the State's evidence satisfactorily proved counts II and III of both petitions for termination of parental rights by clear and convincing evidence. The trial court ordered DCFS to prepare a best interest hearing report and scheduled a best interest hearing for May 28, 2008. Trial judge later reset the hearing to July 7, 2008.

The social services caseworker filed permanency review hearing reports on May 27, 2008. According to the report, police arrested mother on two occasions during the reporting time period. Police arrested mother for possession of cannabis in February 2008. Police found cannabis in a motor vehicle in which mother was riding. Police arrested mother for aggravated battery in April 2008. According to police reports, mother struck another female in the face with a beer can and continued to strike the female after she fell to the ground. Mother admitted to the caseworker that she struck the female but denied drinking alcohol. The State did not file criminal charges against mother. The social service caseworker's report documented that mother completed an intake in December 2007 but did not begin substance abuse and alcohol treatment until March 2008 and had been attending substance abuse and alcohol treatment since that time. The trial court entered permanency review orders on May 27, 2008, finding that the permanency goal and service plan had not been achieved because the mother failed to make reasonable efforts to complete the service plan tasks with one exception. The court noted that mother complied

11

with the service plan tasks beginning after the State initiated termination proceedings.

On July 7, 2008, the trial court conducted a best interest hearing on the July 2007 supplemental petitions to terminate parental rights. The social services caseworker prepared best interest hearing court reports and addendums for the trial court to consider. Jonna Tyler of the Antioch Group prepared the bonding assessment.

At the hearing, the State admitted into evidence mother's medical records marked Exhibit 1. Exhibit 1 contained Methodist Medical Center medical records regarding mother's medical treatment received as a child, including treatment of a lacerated wrist and chest, foot injury, diarrhea, dog bite, and a report that mother was the victim of sexual abuse by a biological parent. Exhibit 1 also contained Methodist Medical Center records dated May 31, 2006, regarding an emergency room visit for anxiety-related symptoms due to stress that showed mother positive for cocaine and cannabis, and medical records dated September 15, 2007, regarding an emergency room visit in which police brought mother to hospital due to uncontrollable and combative behavior and intoxication. Also included was an emergency room visit for neck pain on September 21, 2007, in which mother indicated that she consumed alcohol on September 20, 2007, and an emergency room visit on October 5, 2007, in which mother was intoxicated and combative.

The State also called Bradley Scott, a Peoria police officer, who testified that on October 6, 2007, at approximately 1:30 a.m., he investigated a fight involving mother's brother. The officer observed the mother of A.T. and B.B. to be highly agitated while she tried to push past the officer and aggressively approached another person in police custody. Ultimately, officers placed mother in a squad car to subdue her. Scott also testified that on November 10, 2007, he had

12

contact with mother during a traffic stop and found her to be uncooperative, agitated, and intoxicated. The State offered no other evidence.

Mother's attorney called Karen Tobias to testify. Tobias said that she was currently assigned as the minors' Counseling and Family Services caseworker and had been involved with the case since November 2005. She prepared a best interest hearing report for the court. Tobias stated that since the time she completed the best interest report for the court's consideration, mother had begun domestic violence classes and also had scheduled a psychological examination for July 30, 2008.

Tobias testified that she observed visits between mother and the minors. Tobias said that the minors were happy to see their mother. According to Tobias, A.T. will usually cry for several minutes and cling to her mother at the end of each visit. Visits occurred only once per month, and she indicated that the behavior was not unusual for children in foster care. Tobias explained that the minors had been in current foster care placement for almost 10 months.

She also testified that mother completed inpatient substance abuse treatment and was currently enrolled in an after-care program but still needed to complete domestic violence counseling. Tobias testified that prior to May 2008 mother did not complete requested drug tests but had submitted to random drug tests with clean results since May 2008, missing only one drug test. Tobias explained that she was working with mother on these tasks in relation to another child, Tomy, born to mother in Florida. According to Children's Home system of care report, Tomy is currently placed in the same foster home as A.T. and B.B.

Following the testimony of Tobias, mother testified. She stated that A.T. was five years old and A.T. had lived with her during the first 2 ½ years of A.T.'s life. Mother explained that

13

B.B. was 2 ½ years old. Mother said that she visited the minors regularly after they were taken into protective custody. She admitted that she went to Florida in June 2007 and took both A.T. and B.B. with her. She acknowledged that taking the children to Florida was not a good idea and that she regretted doing so. Mother said that she was involved with services now and that she only had a few services left to complete. Mother explained that it took her a while to become involved in services because she was drinking a lot and she did not know how to cope with her children being in foster care. She was also upset by the death of B.B.'s father.

Mother testified that she now understood that her children needed her. She had made mistakes in the past but now she was willing to turn her life around in order to get her children back. Mother testified that she had not consumed any alcohol in the past couple of months. She said that she knew that her children had a bond with her because of the way they touched her and interacted with her. The affection of her children made her feel really good. She said that she would do whatever she needed to do so that all her children could return to her home.

Mother testified that she was employed and that she currently lived with her own mother. She acknowledged that her own mother had been involved with DCFS and that it would be wise to find alternative housing but that she found it hard to find housing at the time. She asked the court to not terminate her parental rights. She said that she loved her children, and they loved her. Mother proclaimed that she was trying, that she had changed her life, and that she was a better person. Mother believed that she could now take care of her children.

In response to questions from the guardian *ad litem*, Nicholas Owens, mother acknowledged that she had taken the children without permission to the State of Florida, along with the children's foster mother at the time. She testified she did not have a plan at the time she

14

left. They headed to Florida, she said, because B.B.'s father had family there. When she arrived in Florida, she gave birth to her baby, Tomy. She then contacted Bo's family, and she and the children stayed with different family members at different locations. Mother said, at some point, she returned to Illinois but she left the minors in Florida. She stated that she did not return to Florida because the Florida caseworkers located the children and returned the children to Illinois.

The guardian *ad litem* did not present any evidence and did not file a report with the trial court prior to the best interest hearing. Nicholas Owens, who was acting as the children's guardian *ad litem* for purposes of the termination hearing, advised the court the following:

> "The purpose of these hearings is not the best interest of the parents but instead it's the best interest of the children. I guess I will be brief in only saying that in all of this time the evidence and the report indicates that for the majority of it nothing was done at all. The fact that she experienced the same thing herself I don't think makes that better. I think there was an understanding of the situation while it was going on. While it's not necessarily all a product of her not trying to want to be with her kids, she was I think aware of what she needed to do the entire time. So, in the best interest of the children, I have no choice but to agree with the State's position."

At the conclusion of the hearing, the State requested the trial court terminate mother's parental rights. The trial court stated that it considered all of the evidence presented, together with the best interest report, attached documents and the bonding assessment. The trial judge said that it was clear that the minors were bonded to their mother. However, mother had a long

history of not cooperating with DCFS and its designees. The trial court stated that mother had a long history of substance abuse. Further, the trial judge stated that mother did not follow court orders. The judge emphasized that mother took the children to the State of Florida without the court's permission and once in Florida, she exposed the children to an unstable environment. The trial court acknowledged that mother was currently participating in services but those services related to her other child, Tomy.[1] The court found that mother still did not have a stable life or a stable environment for the minors and would not provide any type of stability for A.T. and B.B.

The trial judge found by clear and convincing evidence that it was in the best interest of each of the minors that parental rights be terminated. The court entered a written order terminating mother's parental rights as to both minor children, as well as terminating the rights of A.T.'s father. The court also changed the permanency goal to adoption. Mother filed a timely notice of appeal on July 14, 2008, in both juvenile cases. On appeal, the two juvenile cases were consolidated.

## ANALYSIS

On appeal, mother does not challenge the trial court's finding of her continued unfitness in the context of the termination proceedings. However, mother claims that the trial court erred in finding that the best interests of the children supported the termination of her parental rights.

Tempting as it may be to focus on what a parent has done wrong, at the best interest stage of the termination proceedings, the court must select the approach that *best* provides for the

---

[1] The record shows the permanency goal for Tomy was different from that for A.T. and B.B. However, Tomy resided with the same foster family hoping to adopt A.T. and B.B.

16

child's well-being without adopting a view aimed toward punishing the parent's transgressions. The purpose of the best interest hearing is to minimize further damage to the child.

It is well settled that the best interest hearing shifts the scrutiny of the court to the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 363-64 (2004). To accomplish this goal, our lawmakers allow for the safeguard provided by an appointed guardian *ad litem*, who is duty bound to zealously represent the interests of the children at all stages of the juvenile proceedings, but especially when the biological family bonds are at the crossroads of termination.

When reviewing a trial court's determination that it is in a child's best interest to terminate parental rights, a reviewing court will apply the manifest weight of the evidence standard. *In re R.L.*, 352 Ill. App. 3d 985, 1001 (2004); *In re D.M.*, 298 Ill. App. 3d 574, 581 (1998). A determination will be found to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

A trial court's determination will be given great deference because the trial court is in the best position to observe the conduct and demeanor of the witnesses. *In re D.M.*, 298 Ill. App. 3d at 581. A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *In re* D.F., 201 Ill. 2d at 498, citing, *In re A.P.*, 179 Ill. 2d 184, 204 (1997).

First, we note that the trial judge measured the evidence by a clear and convincing standard rather than the required preponderance of the evidence standard. Even though the court held the State to a higher standard of proof, with this preponderance standard in mind, we examine whether the court's best interest findings were against the manifest weight of the

17

evidence presented to the court at the best interest hearing. It is important to understand that our review is not *de novo* but is restricted to evaluating the factual basis for the court's stated findings and conclusions.

The extraordinary decision to terminate parental rights is governed by the interrelationship of the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2006)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2006)). First, the State must establish that a parent is unfit as defined in the Adoption Act. 705 ILCS 405/2-29 (West 2006); 750 ILCS 50/1(D) (West 2006). If the trial court finds a parent to be unfit as defined by the Adoption Act, the interests of the parent and child diverge. At this point in the juvenile proceedings, the court must decide, based on the evidence presented, whether it is in the best interests of the minor to terminate parental rights. 705 ILCS 405/2-29(2) (West 2006); *In re D.T.*, 212 Ill. 2d 347, 352 (2004). The lawmakers created a two-step process that must be honored. A finding of parental unfitness at the termination stage does not automatically trigger an end to the mother-child relationship and termination should not be viewed as a foregone conclusion by the State.

The State was required to *prove*, by a preponderance of the evidence, that A.T.'s and B.B.'s best interests justified termination of the children's relationship with their mother. Due to the definitions within the Juvenile Court Act, the best interest determination is not an easy task. Prior to termination, the best interests of a child require that no less than eight factors "shall be considered in the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2006). The statutory factors include: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural and religious background; (4) the child's sense of attachment, including love, security, familiarity, continuity of relationships

18

with parent figures; (5) the child's wishes and goals; (6) community ties; (7) the child's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and (10) preferences of the person available to care for the child. 705 ILCS 405/1-3(4.05) (West 2006).

At the best interest stage of termination, the State is required to prove by a preponderance of the evidence that it is in the child's best interest to terminate parental rights. *In re R.L.*, 352 Ill. App. 3d at 1001, citing *In re D.T.*, 338 Ill. App. 3d 133, 154 (2003), *aff'd*, 212 Ill. 2d 347 (2003). In this case, the judge focused on only two factors and did not articulate his view of any of the remaining statutory factors. On July 9, 2008, in the dispositional order terminating parental rights, the judge did not make specific findings of fact, and the transcripts of the proceedings did not include the judge's pronouncement regarding numerous statutory factors. We view the judge's resolution of eight factors as neutral, neither for nor against termination.

The court's findings relied heavily on the consideration of two statutory factors, specifically, the children's sense of attachment, including love, security, familiarity, continuity of relationships with parent figures as required by section 1-3(4.05)(d) of the Juvenile Court Act (705 ILCS 405/1-3(4.05)(d) (West 2006)) and the children's need for permanence as required by section 1-3(4.05)(g) of the Juvenile Court Act (705 ILCS 405/1-3(4.05)(g) (West 2006)).

Mother testified during the best interest hearing that after the court removed the children from her care, she visited her children frequently and resided with them at the foster household. It is not disputed that mother also had frequent contact with the children after fleeing to Florida. Mother also testified that she loves her children and has made progress in the three months since the first stage of the termination process began with the fitness hearing that occurred on April 16,

19

2008. The court acknowledged that mother had made recent progress initiated after her return to Illinois in September of 2007.

We commend the court for ordering the preparation of a bonding assessment, *sua sponte,* and over the State's objection. The social service reports and the State's testimonial evidence did not include any indication that DCFS or a social services caseworker observed these children interact with their mother. In fact, the DCFS placement review summary dated May 9, 2007, informed the court that prior to May of 2007, Ms. Tobias failed to observe any visitations between mother and children contrary to DCFS policies.

The bonding assessment, ordered by the court and prepared by a licensed clinical professional counselor in this case, was a neutral and professional report. The detailed report included both relevant and reliable information gathered from standardized tests and the personal observations of the clinician. The bonding assessment indicated that both children shared a healthy parent-child bond at the time of the report. The court ordered report described mother's conduct during a visit with the children and concluded that mother's approach to her children was genuine and authentic. The assessment stated that mother demonstrated strength in areas of nurturance, challenge, structure and engagement. The court carefully articulated on the record that the children remained very bonded to their mother in this case. This finding is well supported by the record.

Next, the court considered the children's need for permanence. 705 ILCS 405/1-3(4.05)(g) (West 2006). The State's evidence on this issue involved the introduction of medical records showing mother's continued alcohol use. The State also called a police officer as a witness who described contacts with mother when she was both agitated and intoxicated.

20

The court also noted the children did not enjoy a stable lifestyle once they left the State of Illinois. The trial judge stated that mother's recent progress as to A.T. and B.B. was too uncertain to ensure long-term stability for these two minor children based on her past poor performance and lack of motivation. Thus, the trial court correctly weighed this factor in support of termination on the record. Based on the circumstances of this case, we cannot disagree with the court's assessment that mother was unlikely to provide long-term stability for the children absent some remarkable change in her level of cooperation and personal motivation.

Therefore, considering the statutory factors, the record suggests only one factor, the children's need for stability, weighed in favor of termination, while all other factors were either overlooked, neutrally assessed, or, in the case of the children's bonds to their mother, weighed in favor of postponing termination.

Next, we examine the temporal considerations contained in subsection 1(D)(m)(iii) of the Adoption Act selected by the State as the proper basis for the termination of this mother's parental rights. Count III of the State's supplemental petitions for termination of parental rights charged that mother failed to make reasonable progress toward the return of the minors during any nine-month period after the end of the initial nine-month period following the adjudication of neglect, being November 14, 2006, to August 14, 2007, in violation of section 1(d)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West 2006)). This subsection of the Act serves to postpone termination proceedings for 18 months following the date of the dispositional adjudication of neglect, which in this case occurred on February 14, 2006.

The commonsense explanation for this fairly long statutory transitional period may also

21

relate to the best interests of the children. Children maintain strong attachments to their parents, even in the face of both neglect and physical abuse. In theory, A.T.'s and B.B.'s 18-month transition period should have started on February 14, 2006, after the finding of neglect. However, the original foster placement approved by DCFS was both seriously flawed and unstable.

In April of 2006, just two months after the determination of dispositional unfitness, DCFS suspended its role to supervise visits between this mother and her young children. In April, DCFS delegated the responsibility of supervising visits to the foster parent by allowing all visits between the children and their mother to occur at the foster home. As such, DCFS and its designees did not personally observe, assess or monitor the visits or mother's parenting skills. It is undisputed that mother did not attend the scheduled visits to be supervised by DCFS. Nonetheless, the court maintained a "return home" permanency goal from November 2005 until December 19, 2006.

The permanency hearing review reports reveal that under the foster mother's guidance, the children enjoyed monthly visits with their mother. Weekly visits began sometime between the July permanency review and the December permanency review date in 2006. In spite of increased unsupervised visitation between mother and her children, the record shows that the permanency goal changed to substitute care on December 19, 2006. During that same time period, a DCFS worker advised the original foster mother that the case was headed toward termination.

On May 23, 2007, 17 months after DCFS placed the children with the original foster mother, and near the end of an 18-month transition period for mother to make reasonable progress towards reunification, the children's stability once again began to crumble. In May of 2007,

Counseling and Family Services received information of possible drug use by *foster* mother and requested foster mother submit to a drug test. *Foster* mother was previously tested and found to be positive for drug use one year earlier, in the spring of 2006. DCFS also began to suspect mother was spending much more time at the foster home than contemplated by the service plan.

In May of 2007, the police notified Counseling and Family Services that an officer investigating a bad check found mother showering at the foster mother's residence. Moreover, A.T. described an incident to a caseworker in May of 2007 and the details of the child's report to her caseworker suggested that mother and A.T. were sleeping in the same bed at the foster residence. Thereafter, during an unannounced visit, the children's caseworker also observed mother at the foster mother's residence and concluded mother was approximately eight months along in a new pregnancy. DCFS was previously unaware of mother's pregnancy. Within days of the unannounced visit, the children were missing, along with their foster mother and mother. The court issued a protective warrant for the return of the children on June 8, 2007. However, the warrants were not served until mid-September of 2007.

The court was justifiably concerned about the removal of the minors from the State of Illinois due to the cooperative efforts of the foster mother and mother. On the juvenile judge's own motion, the court ordered DCFS to file a status report explaining the situation and the judge scheduled a hearing on the issue for August 7, 2007. According to the status report prepared by DCFS for the court, following its initial investigation, DCFS could not find any immediate or urgent safety concerns associated with the original foster mother. The children were not immediately removed and placed in another foster household while the foster mother's drug test was being processed. However, DCFS intended to change the children's foster care placement in

23

June 2007. The foster mother appealed that decision, and DCFS had not completed the appeal process when the foster mother and mother fled with the children.

In light of these unusual circumstances, it is not surprising that the children were bonded to their mother at the time of the best interest hearing. The first nine months, following the nine-month period after dispositional unfitness, was a period of time when mother and the foster mother acted together, without discovery or intervention from DCFS, to maintain an unlimited and unsupervised relationship between mother and her children. This was not what our legislators intended to occur during the 18 months following an adjudicatory order by the court finding a parent to be dispositionally unfit, and immediately preceding the State's petition to terminate parental rights pursuant to section 1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West 2006).

By all accounts, beginning in June 2007, DCFS lost all contact with the minor children, in part, because the *foster* mother did not cooperate with DCFS and helped remove the children from the state without permission. Normally, when a mother flees the State of Illinois, the children remain safely protected in suitable foster placement. However, instead of growing geographically distanced from their mother, who fled the State, these children departed with their mother and continued their strong maternal bonds. We cannot condone the foster mother and mother's combined actions, nor do we fully comprehend the long-term inattentiveness of DCFS to the negative circumstances of the children in their first foster home.

Here, many factors worked against creating a stable environment for the children. A true protective foster care placement did not begin for the children until after DCFS placed A.T. and B.B. with the second foster family in mid-September of 2007. At the time of the best interest

24

hearing, A.T. and B.B. were five and two years old, respectively. Even though more than 2 ½ years transpired after the shelter care hearing took place in November of 2005, the children had only been separated from their mother on an effective basis for 10 months, after placement with a second foster family.

In those 10 months, mother was employed, completing services related to a third child, and struggling to maintain a drug-free and alcohol-free lifestyle without supportive social services relating to these children because of the change of permanency goals. Meanwhile, the children struggled with separation from their mother and once again found themselves adjusting to monthly visits with their mother for a second time in their short lives. There were times of significant emotional responses from the children when they were called upon to leave their mother at the end of each visit.

It does not matter where the fault is assigned for the flawed foster situation or the instability that did not subside for the children while in foster care. The original placement caused the children to share an uninterrupted relationship with their mother, and it is in this context the court should have viewed the evidence. Terminating the children's relationship with their mother 10 months after effective removal from her control created an unnecessarily accelerated time table for these young children.

This mother's ability to sustain long-term progress is less than certain even with the proper supportive structure and scrutiny from DCFS. However, the juvenile judge should have focused on whether continued restricted contact with their mother was necessary for the *children* to avoid feeling a sense of abandonment, confusion, or inevitable crisis. We conclude the trial judge overlooked the fact that the children's bonds to their mother continued and may have grown

25

stronger due to the mismanaged first placement.

After considering the legislative timeline that governs the fitness issue in this case, the unique facts, the undisputed strong mutual bonds between mother and children, and the minimal evidence presented by the State during the best interest hearing, we conclude that the trial court's best interest finding, while well-intended, was contrary to the manifest weight of the evidence and cannot stand. Therefore, we remand the matter to the trial court to set a permanency review hearing on an expedited basis and develop an appropriate service plan for these young children, who remain simultaneously bonded to both their mother and their second foster family.

The judgment of the circuit court of Peoria County is reversed.

Reversed and remanded with directions.

McDADE, P.J. and O'BRIEN, J., concur.