NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220288-U

NO. 4-22-0288

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 11, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Morgan County |
| Plaintiff-Appellee, | ) | No. 19JA1 |
| | ) | |
| v. | ) | Honorable |
| Jesse R. | ) | Jeffrey E. Tobin, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1 *Held*: The appellate court affirmed, finding the trial court's determinations that respondent was an "unfit person" and it was in the minor's best interests to terminate respondent's parental rights were not against the manifest weight of the evidence.

¶ 2   In January 2019, the State filed a petition for adjudication of wardship with respect to A.S, the minor child of respondent, Jesse R. The trial court placed A.S. in the temporary custody and guardianship of the Department of Children and Family Services (DCFS). In October 2021, the State filed a motion to terminate respondent's parental rights. The court found respondent unfit and determined it was in A.S.'s best interests to terminate respondent's parental rights. Respondent appeals, arguing the trial court erred in (1) finding him unfit and (2) determining it was in A.S.'s best interests to terminate respondent's parental rights. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On January 4, 2019, Dalana T. gave birth to A.S. Dalana had a history of involvement with DCFS and had another child, T.B., who resided in a licensed relative foster home with his maternal grandmother. At that time, respondent was in custody at the Morgan County jail.

¶ 5        On January 8, 2019, the State filed a petition for adjudication of wardship of A.S., alleging he was neglected because he would be released or discharged to someone who had previously abused or neglected a child. The trial court placed A.S. in the temporary custody of DCFS with an adjudicatory hearing set for March 7, 2019. At the hearing, Dalana admitted to the allegation in the petition for wardship, and the court set a dispositional hearing for May 23, 2019.

¶ 6        At the hearing, the court placed custody and guardianship of A.S. with DCFS. The court set a permanency hearing for November 21, 2019. A permanency hearing report, prepared by foster care manager Chelsie DeGroot, identified respondent as A.S.'s alleged father. DeGroot confirmed that, as of May 3, 2019, respondent was incarcerated in the Morgan County jail and had been there since October 3, 2018. An offender search showed he was sentenced on August 1, 2019, to six years' incarceration for delivery of methamphetamine and had a projected parole date in October 2021. DeGroot reported respondent had a history of criminal charges related to illegal substances and domestic violence. She recommended a court order for paternity testing. The court ordered paternity testing, which revealed respondent as A.S.'s biological father. In January 2020, respondent filed a motion to confirm parentage and averred he was A.S.'s biological father. He further averred he was incarcerated with an expected release date in October 2021.

¶ 7        In December 2019, A.S. moved to a licensed relative foster home with his maternal grandmother and T.B. An October 2020 permanency report prepared by caseworker Lisa Hallmark stated respondent had been moved to a state prison. Respondent said he was on a waitlist for substance abuse and domestic violence programs at the prison. However, when Hallmark spoke to prison officials, they stated respondent was not on a waitlist for any programs. Respondent had not engaged in any mental health counseling while in prison and had not participated in parenting classes. He had not participated in visitation with A.S. due to his incarceration four hours away from where A.S. resided and A.S. being less than two years of age. Hallmark recommended respondent's parental rights be terminated. Subsequent reports by other DCFS staff members also recommended termination of respondent's parental rights.

¶ 8        On October 21, 2020, the State filed a petition for termination of parental rights, seeking termination of both parents' rights. Over the course of A.S.'s custody with DCFS, Dalana did not engage in services to correct the circumstances that brought A.S. into DCFS care and ceased visiting with A.S. She did not appear at various hearings on the petition for termination of parental rights but eventually appeared and admitted the allegations in the petition. The eventual termination of her parental rights is not at issue in this appeal.

¶ 9        As to respondent, the State alleged in part he was unfit according to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) and section 2-29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 (West 2020)), because he was "depraved as defined by Illinois law as evidenced by having three or more prior felony convictions, the most recent of which was within the last five years." See 750 ILCS 50/1(D)(i) (West 2020). The court set an unfitness hearing for January 2022.

¶ 10 On January 6, 2022, Hallmark prepared a "Best Interests/Fitness Report," recommending A.S.'s permanency goal be changed to adoption. In the report, Hallmark noted A.S. resided in a large historic four-bedroom home with T.B., his grandmother, her paramour David K., David's disabled adult son, and David's teenage son. A.S. shared a bedroom with T.B. He called his grandmother "mom" and David "dad" or "pop." Hallmark reported visits to the home went "exceptionally well" and there were no concerns about A.S.'s care. A.S. was bonded with his grandmother and looked to her and her extended family for comfort. His grandmother had a savings account set aside for him and had been preparing for his future with her.

¶ 11 Regarding respondent, Hallmark reported he completed online parenting classes, but not with a DCFS approved provider. He submitted to multiple toxicology tests and his most recent four tests were negative for all substances. Respondent attended a weekly substance abuse meeting. DCFS referred respondent to domestic violence services, and he completed an assessment, but due to his work schedule, the service provider could not accommodate respondent. Hallmark reported DCFS was working to find services that would work with respondent's schedule. However, she also wrote: "It should also be noted that [respondent] does have a history of [v]iolence and has had multiple indicated DCFS reports. This worker believes that it is in the best interest of [A.S.], that [respondent's] parental rights be terminated."

¶ 12 At the January 13, 2022, unfitness hearing, DeGroot testified that, during her time on the case, she would not have recommended a return to home or reunification of A.S. with either parent. The State entered into evidence exhibits showing respondent's previous criminal charges and convictions. Those showed respondent had been convicted of six felony drug offenses in 2004, 2005, 2010, 2011, and 2018. In addition, in 2004, he was convicted of misdemeanor battery causing bodily harm (720 ILCS 5/12-3(a)(1) (West 2002)). In 2016, he was

convicted of felony domestic battery involving physical contact of an insulting or provoking nature with any family or household member (720 ILCS 5/12-3.2(a)(2) (West 2016)).

¶ 13　　　　Respondent testified he was 50 years of age and residing with the grandmother of one of his children. He had taken steps to obtain his own housing. Aside from A.S., he had four other children. Three of them were adults and one was six years old. His parental rights with respect to his other children had never been terminated. Without providing details, respondent stated he had a relationship with his other children but described his relationship with his six-year-old child as "off and on." He did not have visitation with that child as a part of his parole.

¶ 14　　　　Respondent testified he was in custody when A.S. was born and he was released from prison in June 2021. After his release, he obtained a job and had been working for about four months total and at about 50-60 hours per week over the past two months. Respondent stated his sister could care for A.S. while he was working. He began two-hour supervised visits with A.S. around September 2021 and had seen him about 15 times. A.S. had started calling him "[d]ad."

¶ 15　　　　Respondent attended DCFS-ordered counseling and took drug tests. He completed an eight-hour domestic violence class, a four-hour behavior modification class, and a four-hour parent education and family stabilization course. The record indicates the courses were online. Respondent stated he sought out the courses on his own because DCFS did not arrange courses for him. He said he was remorseful about his past convictions because "it has taken me away from my kids." Respondent did not present any other witnesses to testify on his behalf.

¶ 16　　　　On cross-examination respondent admitted, when he was first incarcerated in 2004, he was taken away from his three oldest children, who were minors at the time. He

conceded their presence and their need to have him as a father in their life did not stop him from doing things that caused him to be sentenced to prison. He further admitted when he was released from prison in 2007, he again took part in activities that caused him to be taken away from his children. However, he stated his children were not with him at that time because they were living in different states. He had spent four different periods of time in prison. His youngest child was alive during his two most recent periods of incarceration. He further acknowledged A.S. was born while he was in custody.

¶ 17　　　　The State argued it showed respondent met the statutory presumption of depravity and respondent failed to rebut it. See 750 ILCS 50/1(D)(i) (West 2016). The State noted respondent had seven total prior felony convictions, with two in the past five years. The State argued that respondent's criminal history provided little confidence he would not be convicted of further crimes in the future. The trial court found the State met its burden of proof to establish respondent was depraved and respondent failed to rebut the presumption of depravity. In its written order, the court more broadly found the State proved respondent was depraved by clear and convincing evidence. Accordingly, the court found him unfit and scheduled a best-interests hearing.

¶ 18　　　　At the March 10, 2022, best-interests hearing, Hallmark testified she was A.S.'s current caseworker and was "privy to [a] debrief session with the previous caseworker." A.S. was currently three years of age. His placement with his grandmother was an "adoptive placement." A.S. was bonded with his grandmother, loved her, and his physical and emotional needs were being met. His grandmother took him for medical checkups for a heart condition. Hallmark had no concerns about his placement. Hallmark testified that although she did not attend visits between respondent and A.S., she had reviewed reports of agency visits between

them. She testified that "[i]f there was any bond, it was very little." She explained that although A.S. recognized respondent, Hallmark could not recall if A.S. recognized respondent as his father or not. Hallmark acknowledged she could not point to any report stating there was no bond between respondent and A.S. In her opinion, it was in A.S.'s best interests that respondent's parental rights be terminated so that his grandmother could adopt him. A case advocate report also noted no concerns with A.S.'s placement and stated A.S. "appears to have a wonderful relationship with his brother and grandmother."

¶ 19 Respondent testified he continued to hold his job and test negative for drug use. Respondent loved A.S. and, over the course of his visitation, A.S. began calling respondent "[d]ad." Respondent believed A.S. loved him because A.S. looked forward to spending time with him. Respondent had not met A.S.'s grandmother but conceded A.S. appeared happy and well cared for. He had never provided financial support for A.S. because he "wasn't able to."

¶ 20 The trial court found it in the best interests of A.S. to terminate parental rights. This appeal followed.

¶ 21 II. ANALYSIS

¶ 22 Respondent contends the trial court's fitness and best interests determinations were against the manifest weight of the evidence. He concedes the State proved by clear and convincing evidence he was "depraved" under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)), creating a rebuttable presumption of depravity. However, he argues he rebutted the presumption by showing his efforts at rehabilitation and work toward reunification with A.S. He then argues it was not in the best interests of A.S. to terminate his parental rights.

¶ 23 A. Unfitness Finding

¶ 24 Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2020)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 363-366 (2004).

¶ 25 The State must prove unfitness as defined in section 1(D) of the Adoption Act by clear and convincing evidence. 750 ILCS 50/1(D) (West 2020). Grounds for unfitness include depravity. *Id.* "Depravity" is defined as " 'an inherent deficiency of moral sense and rectitude.' " *In re A.M.*, 358 Ill. App. 3d 247, 253 (2005) (quoting *Stalder v. Stone*, 412 Ill. 488, 498 (1952)). Depravity must be shown to exist at the time of the petition to terminate parental rights, and the acts constituting depravity must be of sufficient duration and repetition to establish a "deficiency" in a moral sense and either an inability or an unwillingness to conform to accepted morality. *Id.* "Where the presumption of depravity is rebuttable, the 'parent is still able to present evidence showing that, despite his convictions, he is not depraved.' " *Id.* (quoting *In re J.A.*, 316 Ill. App. 3d 553, 562 (2000)).

¶ 26 Section 1(D)(i) of the Adoption Act states "[t]here is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State or any other state *** and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 2020).

¶ 27 If a party presents evidence to rebut the presumption of depravity, " 'the presumption ceases to operate, and the issue is determined on the basis of the evidence adduced at

trial as if no presumption had ever existed.' " *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 24 (quoting *J.A.*, 316 Ill. App. 3d at 562). "The only effect of the rebuttable presumption is to create the necessity of evidence to meet the *prima facie* case created thereby, and which, if no proof to the contrary is offered, will prevail." *J.A.*, 316 Ill. App. 3d at 563.

¶ 28    The amount of evidence required from an adversary to meet the presumption is not determined by any fixed rule. *Id.* "The statutory ground of depravity requires the trier of fact to closely scrutinize the character and credibility of the parent and the reviewing court will give such a determination deferential treatment." *Id.* For example, a parent can rebut the depravity presumption by presenting evidence showing that, despite the convictions, he or she is not depraved. *A.M.*, 358 Ill. App. 3d at 253. But, if a strong presumption arises, the weight of the evidence brought in to rebut the presumption must also be great. See *J.A.*, 316 Ill. App. 3d at 563.

¶ 29    Because the trial court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001). Further, in matters involving minors, the trial court has broad discretion and receives great deference. *Id.* Thus, a reviewing court will not disturb a trial court's unfitness finding and best-interests determination unless they are contrary to the manifest weight of the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005) (fitness finding); *In re J.L.*, 236 Ill. 2d 329, 344 (2010) (best-interests determination). A trial court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354.

¶ 30    At the unfitness hearing, the State admitted into evidence respondent's seven felony convictions. Six of those were for drug offenses in 2004, 2005, 2010, 2011, and 2018. Notably, in 2016, respondent was also convicted of felony domestic battery involving physical

contact of an insulting or provoking nature with any family or household member (720 ILCS 5/12-3.2(a)(2) (West 2016)). Thus, the State presented sufficient felony convictions to give rise to a rebuttable presumption that respondent was depraved. Respondent does not dispute that point. Instead, relying on *In re L.J.S.*, 2018 IL App (3d) 180218, he argues he rebutted the presumption because the State failed to present sufficient evidence of depravity aside from his convictions.

¶ 31    In *L.J.S.*, the State presented evidence the child's father had previous criminal sexual abuse convictions sufficient to support a presumption of depravity. *Id.* ¶ 7. The trial court then shifted the burden to the father to prove by clear and convincing evidence he was not depraved. *Id.* ¶ 13. The Third District, with the agreement of the State, found that determination in error, stating the father needed to provide only some contrary evidence of depravity to rebut the presumption. Because the father presented evidence he attended sex-offender treatment, had been seeing a doctor, and had not been in trouble since his release from jail, the presumption was rebutted. Thus, the trial court erred by not requiring the State to meet its burden of showing depravity by clear and convincing evidence. *Id.* ¶ 22. However, the court upheld the trial court's overall finding of unfitness because the father failed to make reasonable efforts to correct the conditions that were the basis for the child's removal. *Id.* ¶ 25.

¶ 32    Here, unlike in *L.J.S.*, the trial court did not misstate the burden of proof. Nor do we agree that the presentation of any evidence at all is always sufficient to overcome the presumption of depravity or that the State relied solely on the number of respondent's convictions to show his depravity.

¶ 33    The key to rebutting a presumption of depravity is a parent's ability to show he or she has been rehabilitated. See, *e.g.*, *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167 (2003)

(finding that parent could not rebut presumption of depravity because she "ha[d] shown no evidence that she [was] rehabilitated"). A parent's rehabilitation can be shown where the parent leaves prison and maintains a lifestyle "suitable for parenting children safely." *Id.* Consequently, evidence a parent, after being released from prison, leads a law-abiding life and complies with DCFS services may constitute clear and convincing evidence of a lack of depravity. See, *e.g.*, *In re Gwynne P.*, 346 Ill. App. 3d 584, 599 (2004) (finding that mother convicted of drug offenses and theft rebutted presumption of depravity where she maintained sobriety, completed drug treatment program, had been employed continuously for seven months, completed parenting classes, and acted appropriately at all visits with her child); *J.A.*, 316 Ill. App. 3d at 563 (affirming trial court's finding father rebutted depravity presumption where father prepared room in his home in case he regained custody of child, provided financial and emotional support for child, visited child more frequently than required by DCFS, and was in "constant contact" with child).

¶ 34 But participation in some services or some efforts at rehabilitation does not necessarily overcome the presumption of depravity. See, *e.g.*, *A.M.*, 358 Ill. App. 3d at 254 (finding evidence father obtained his GED, completed career training classes, enrolled in parenting and drug abuse classes, and had been approved for work release from prison was insufficient to overcome presumption of depravity); *Addison R.*, 2013 IL App (2d) 121318, ¶ 30 (finding evidence mother completed substance abuse and psychiatric programs and enrolled in college courses while in prison, "while commendable, [was] insufficient evidence of rehabilitation or lack of depravity"); *Shanna W.*, 343 Ill. App. 3d at 1167 ("Receiving a few certificates for completing basic services in prison, while commendable, is not a difficult task and does not show rehabilitation.").

¶ 35 Notably, a parent's habit of committing crimes, resulting in that parent's absence from his or her children's lives is, in and of itself, independent evidence of depravity. For example, in *In re T.S.*, 312 Ill. App. 3d 875 (2000), the appellate court affirmed a finding of depravity where, although the respondent father expressed a desire to care for his son and complete any necessary programs upon being released from prison, "the evidence showed that he continued to commit crimes when he had three other children who presumably needed him." *T.S.*, 312 Ill. App. 3d at 878. Further, the type and severity of a parent's crimes is relevant to the determination. In *Addison R.*, the respondent mother pursued every program offered to her while incarcerated, but the appellate court affirmed a finding of depravity based largely on the seriousness of the mother's conduct that resulted in her criminal convictions. *Addison R.*, 2013 IL App (2d) 121318, ¶ 27.

¶ 36 We also find persuasive the order of the Second District in *In re J.L.*, 2021 IL App (2d) 200484-U (cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)). There, the trial court found the respondent failed to rebut the presumption of depravity. The record established, in part, that in addition to five felony convictions, including violations of the Illinois Controlled Substances Act (720 ILCS 570/100 *et seq.* (West 2004)), aggravated battery, and residential burglary, the State submitted evidence respondent had a history of domestic violence. The Second District noted that even if the trial court incorrectly determined respondent's evidence was insufficient to rebut the presumption of depravity, the record demonstrated the finding of unfitness based on depravity was done after the trial court closely scrutinized the respondent's character and credibility. While the respondent presented information about his behavior after his release from prison, and finding him unfit was a "closer

call" because of that information, the appellate court could not say the opposite result was clearly evident. *J.L.*, 2021 IL App (2d) 200484-U, ¶ 25.

¶ 37    Here, the record shows respondent repeatedly committed crimes resulting in incarceration when he had children. In particular, his six-year-old child was alive during his two most recent periods of incarceration. Although his parental rights with respect to his other children had never been terminated, and respondent generally stated he had relationships with them, the record shows he was incarcerated during times in their childhoods. Respondent presented no evidence of his emotional, physical, or financial support for them when they were children. Notably, respondent described his relationship with his six-year-old child as "off and on," and he did not have visitation with that child as part of his parole. He further acknowledged A.S. was born while he was in custody.

¶ 38    Additionally, respondent's past, including recent past, included convictions of crimes of violence and domestic violence. In 2004, he was convicted of misdemeanor battery causing bodily harm. In 2016, he was convicted of felony domestic battery involving physical contact of an insulting or provoking nature with any family or household member. Although respondent took a domestic violence course, it consisted of only an eight-hour course that was not approved by DCFS. Thus, the State presented a number of convictions beyond those required by statute, and that, and the nature of all the convictions, was sufficient evidence to establish defendant's depravity.

¶ 39    While defendant had successful supervised visits with A.S., obtained employment, took a few classes, and passed drug tests, he also, notably, had not yet provided financial support for A.S. or obtained independent housing for himself and A.S. While incarcerated, he said he was on a waiting list for classes, but prison officials told his caseworker

otherwise. Aside from his own testimony, he did not present any witnesses to support his aspirational statements of his ability to care for or support A.S. While respondent took commendable actions indicating that in the future his conduct may conform to accepted morality, the trial court's finding he behaved in a depraved manner was supported by the evidence in the record. See *In re J.V.*, 2018 IL App (1st) 171766, ¶ 242. Thus, we note even if we were to assume respondent's evidence was sufficient to rebut the presumption of depravity, the trial court's overall finding he was depraved was not against the manifest weight of the evidence because the opposite conclusion was not clearly evident. See *J.L.*, 2021 IL App (2d) 200484-U, ¶ 25 (cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e)).

¶ 40                                    B. Best Interests Determination

¶ 41            Respondent next argues the trial court erred in finding it was in A.S.'s best interests to terminate his parental rights.

¶ 42            Once a parent has been found unfit under one or more grounds set out in the Adoption Act, the State must establish by a preponderance of the evidence that it is in the minor's best interest to terminate parental rights. *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 97. "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686 (2006). Once a parent is found unfit, the focus shifts to the child, and the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *D.T.*, 212 Ill. 2d at 364. Thus, following an unfitness finding, the trial court focuses on the needs of the child in determining whether the parental rights should be terminated. *J.V.*, 2018 IL App (1st) 171766, ¶ 249. "In determining the best interests of a child, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* " 'A

- 14 -

child's best interest is superior to all other factors, including the interests of the biological parents.' " *Id.* (quoting *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 52).

¶ 43    The Juvenile Court Act lists several factors the trial court should consider when making a best-interest determination. Those factors, considered in the context of the child's age and developmental needs, include the following:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

Also relevant in a best-interests determination is the nature and length of the minor's relationship with his or her present caretaker and the effect that a change in placement would have on the child's emotional and psychological well-being. *In re William H.*, 407 Ill. App. 3d 858, 871 (2011).

¶ 44    Relying on *In re B.B.*, 386 Ill. App. 3d 686 (2008), respondent argues the State's evidence was "limited," and suggests the "scant" evidence was insufficient to address most of the statutory factors. That reliance is misplaced, as the facts in *B.B.* are different from respondent's case.

¶ 45        In *B.B.*, the appellate court found only one factor, the child's need for stability, weighed in favor of termination, while all other factors were overlooked, neutrally assessed, or weighed against termination. *Id.* at 700. There, even though the children had been removed from their mother's care for over 2½ years, the mother lived in the children's previous foster home for many months. As a result, the children had been separated from their mother for only 10 months following placement with a second foster family. *Id.* at 702-03. During that 10-month period, the mother was employed and completed recommended tasks in her service plan but struggled to remain drug and alcohol free. *Id.* at 703. Additionally, the record in *B.B.* established the children's first foster placement was seriously flawed and unstable and the children had only been in a true protective foster placement for 10 months. *Id.* Moreover, the children displayed significant emotional responses when visitation ended with their mother. *Id.*

¶ 46        Here, the record shows A.S. is bonded with his grandmother and extended family. He has lived with them for most of his life. He shares a room with his brother in a suitable home and refers to his grandmother and her paramour using terms such as "mom," "dad," and "pop." The State presented evidence his emotional and physical needs were well met. A.S. also has specific medical needs that are being met, and his grandmother has begun planning for his financial future. In comparison, respondent was incarcerated and unknown to A.S. for most of A.S.'s life. He has visited A.S. for approximately 15 two-hour visits but has not shown sufficient preparation to care for him and admitted he has not provided financial assistance. He did not address how he would care for A.S.'s medical needs. While respondent loves A.S. and has taken steps toward rehabilitation with A.S. in mind, the child's best interest is superior to all other factors, including the interests of the biological parents. *In re V.M.*, 352 Ill. App. 3d 391, 398 (2004). In sum, we agree with the State that the evidence adequately addressed multiple statutory

factors and the trial court's best-interest determination was not against the manifest weight of the evidence.

¶ 47                                III. CONCLUSION

¶ 48            The trial court's termination of parental rights was not against the manifest weight of the evidence. Accordingly, the trial court's judgment is affirmed.

¶ 49            Affirmed.