NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200566-U

NO. 4-20-0566

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 31, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | No. 18JA252 |
| v. | ) | |
| Meghann C., | ) | Honorable |
| Respondent-Appellant). | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The appellate court affirmed, concluding that the trial court's finding of unfitness
and termination of respondent's parental rights were not against the manifest weight
of the evidence.

¶ 2     In November 2018, the State filed a petition for wardship of L.C., the infant child

of respondent, Meghann C. In January 2019, the trial court adjudicated the minor neglected and

abused, made her a ward of the court, and placed custody and guardianship with the Illinois

Department of Children and Family Services (DCFS). The State filed a petition to terminate

respondent's parental rights in January 2020. After separate hearings, in August and October of

2020, the court found respondent to be an unfit parent and that it was in the minor's best interests

to terminate respondent's parental rights.

¶ 3     On appeal, respondent argues the trial court erred in terminating her parental rights.

Specifically, she alleges the court erred in finding she was an unfit parent for failing to (1) maintain

a reasonable degree of interest, concern, or responsibility as to the minor's welfare, (2) make reasonable efforts to correct the conditions that were the basis for the minor's removal from respondent's care, and (3) make reasonable progress toward the return of the minor within nine months following the adjudication of neglect. She also claims the court's best-interest determination was against the manifest weight of the evidence. We affirm.

¶ 4                                   I. BACKGROUND

¶ 5                               A. Neglect Proceedings

¶ 6        On October 14, 2018, DCFS received a hotline call expressing grave concerns about the minor's father and respondent's husband, Tommy C., and his mental health, drinking, and abusive behavior. According to the caller, she had witnessed the aftermath of an incident when Tommy C. had nailed respondent to the wall by the skin between her fingers, used a blow torch to burn the Superman logo into her back, and mutilated her nipples. Although respondent denied a problem, refused to press charges, and refused to leave Tommy C., the caller feared for the safety of their newborn child, L.C., born October 13, 2018. However, respondent and Tommy C. agreed to an intact case, meaning DCFS would monitor a safety plan where respondent and L.C. could live with respondent's mother without Tommy C. By November 7, 2018, the parents were not complying with DCFS's directives and the infant was taken into protective custody, out of respondent's care. L.C. remained in her grandmother's home, where she continues to reside.

¶ 7        On November 21, 2018, the State filed a petition for adjudication of neglect and abuse. The State alleged L.C.'s environment was injurious to her welfare when she resided with her parents because of Tommy C.'s unresolved substance abuse and mental illness, which caused him to be delusional and abusive. The State also alleged, with regard to L.C.'s injurious environment, that respondent was unwilling or unable to separate from Tommy C. On these same

grounds, the State alleged L.C. was an abused minor because her parents created a substantial risk of physical injury to her. We note Tommy C. is not a party to this appeal.

¶ 8        After an evidentiary hearing on January 28, 2019, the trial court entered an adjudicatory order finding L.C. to be neglected and abused within the meaning of the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (West 2018)). On April 10, 2019, the court entered a dispositional order finding it would be consistent with the health, welfare, and safety of L.C. to make her a ward of the court.

¶ 9        Both parents appealed the trial court's adjudicatory and dispositional orders. In a consolidated decision, this court affirmed. See *In re L.C.*, 2019 IL App (4th) 190269-U.

¶ 10                B. Termination of Respondent's Parental Rights

¶ 11        On January 7, 2020, the State filed a petition to terminate respondent's parental rights. The State alleged she was an unfit person pursuant to Illinois's Adoption Act (750 ILCS 50/1(D) (West 2018)) and identified three grounds supporting its allegation: (1) she failed to maintain a reasonable degree of interest, concern, or responsibility as to L.C.'s welfare (750 ILCS 50/1(D)(b) (West 2018)), (2) she failed to make reasonable efforts to correct the conditions that were the basis for the removal of L.C. from her care during any nine month period following adjudication of neglect and abuse (750 ILCS 50/1(D)(m)(i) (West 2018)), and (3) she failed to make reasonable progress toward the return of L.C. to her care during any nine-month period following adjudication of neglect and abuse, namely between January 29, 2019, and October 29, 2019, and between April 3, 2019, and January 3, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 12        At the fitness hearing on August 13, 2020, the State presented the testimony of Roger Fitzgerald-Jackson, the assigned caseworker from Lutheran Child and Family Services (LCFS). He was assigned the case in February 2019, after respondent's case plan had already been

developed. Respondent's services included mental health counseling, a substance abuse assessment, and domestic violence services. She was also required to cooperate with LCFS and achieve stability.

¶ 13 According to Fitzgerald-Jackson, respondent participated in mental health and substance abuse assessments early in the case—when it was an intact case. Since that time, and with additional concerns, respondent was referred for a full psychological examination, which was not completed. He blames that partly on respondent's noncompliance and partly on the fact that they were unable to complete the integrated assessment until January 22, 2020, after the petition to terminate was filed. He said respondent cited religious considerations for her "extreme resistance" to drug tests. In approximately April 2020, not during the nine-month period at issue, respondent completed a self-reporting substance abuse assessment, which did not satisfy her case plan requirements. Also, respondent participated in a self-reporting domestic violence assessment, where she claimed no problematic issues and where her history with Tommy C. was not considered.

¶ 14 Fitzgerald-Jackson testified respondent stopped visiting L.C. in April or May 2019. She and Tommy C. moved to Ohio in August or September 2019. There, she did not complete any services. They have since moved, but as of the date of the hearing, they did not reside in Illinois. In Fitzgerald-Jackson's opinion, respondent will not comply with her recommended services because she minimizes the issues and denies the existence of any problems. According to Fitzgerald-Jackson, respondent has taken no steps forward since the beginning of the case. He explained:

> "[Respondent's] services are innately linked to her husband's services due to the fact that they reside in the same environment, so even if she were to complete

services, if she's not willing to either leave her relationship or otherwise distance herself from the person who makes her environment unsafe, then I cannot say that she would successfully complete services even if she were to do the tests."

The State rested.

¶ 15 Respondent testified that, while living in Decatur, she was employed as a sleep-lab technician at Decatur Memorial Hospital for 10 years. She said it was "very difficult" to contact the caseworker by telephone but they "finally were able to start communicating via e-mail." Respondent testified that between January 2019 and January 2020, she requested referrals for services but she did not receive any. She attempted to participate in services on her own. For example, she contacted DOVE in Decatur regarding domestic violence services, but they referred her back to her caseworker. While living in Ohio, she tried to stay in contact with the caseworker but, according to her, he "never answered his phone or got back with any messages or anything."

¶ 16 Respondent testified L.C. was "the most important in [her] life, and whatever [she] need[ed] to get done, [she] need[ed] to get done." According to respondent, she has tried to complete everything LCFS has asked her to do. She was just waiting for Fitzgerald-Jackson to tell her when and where to show up, and she would be there. She said the integrated assessment could not be completed in January 2019 because of the "frigid weather." She was trying to find a job and move back to Illinois to "spend more time and be closer to our daughter."

¶ 17 On cross-examination, respondent testified she and Tommy C. moved from Illinois in October 2019. When asked why she could not have completed the integrated assessment between January and October of 2019, she again blamed it on the January weather, providing no further explanation. She was aware she was required to participate in a full psychological assessment, but she said she never got the referral. She said: "But as soon as he says, you know,

show up on this date at this time, [she] will be there."

¶ 18     After considering the evidence and arguments of counsel, the trial court found no part of respondent's case plan was successfully completed. The domestic-violence assessments in which she participated were self-reporting and of no value. She failed to undergo a full psychological evaluation as recommended. The court found respondent's goals of stability and cooperation were likewise "never successful." In fact, according to Fitzgerald-Jackson's testimony, not "even any single component of a service plan" was ever rated successful. Further, the court noted Fitzgerald-Jackson's testimony that it was not foreseeable, even if respondent began services, that LCFS could safely return L.C. to respondent in the near future. This was so because "the father has unaddressed mental health issues as far back as 2011, and [respondent] continues to maintain a relationship with the father." Respondent "essentially den[ies] that there's any problem[.]" The court recalled Fitzgerald-Jackson's answer when he was asked if there was any progress or any positives from January 2019 through January 2020. Fitzgerald-Jackson said no; there was no progress, no positives. The court found his testimony to be credible.

¶ 19     Further, the trial court found respondent's testimony was not credible. The court noted respondent failed to provide a reasonable explanation why she could not participate in an integrated assessment between January 2019 and October 2019.

¶ 20     The trial court found the State had proved by clear and convincing evidence respondent was an unfit parent as alleged in the three grounds stated in the petition to terminate.

¶ 21     On October 26, 2020, the trial court conducted the best-interest hearing. The State presented the testimony of Fitzgerald-Jackson. He testified he prepared the best-interest report for the court. He noted the address for respondent should be changed to Missouri, rather than Kentucky, as she had again relocated.

¶ 22       Fitzgerald-Jackson testified L.C. was in a prospective adoptive placement with her grandmother, where she had resided since being taken into protective placement. He said L.C. was a "happy, bubbly kid, very smiley." She attended day care, which had some preschool elements to it. She lived with four other children in the home, who refer to her as their sibling; they call her "sissy." Both foster parents are "very active within their own families," they attend church, and "do some community events." In Fitzgerald-Jackson's opinion, it would be in L.C.'s best interest to terminate respondent's parental rights due to the ongoing and unaddressed mental health and substance abuse issues of Tommy C. and "the fact that we have an underlying issue of domestic violence that has gone unaddressed." The issue with respondent is her ongoing relationship with Tommy C., which causes the entire home environment to be unsafe.

¶ 23       On cross-examination, Fitzgerald-Jackson testified he reviewed his case aide's notes regarding recent visitation between respondent and L.C. He said respondent was affectionate toward L.C. but L.C. "sometimes [took] a while *** to warm up to" her. He identified the concern regarding "the child's willingness to approach the parents."

¶ 24       The trial court noted it reviewed the best-interest report, which noted that L.C. was a happy, healthy, and well-developed toddler. She was very integrated into the home with photographs of her displayed on the walls with other family photographs. She was financially secure in the home and has a strong bond with all other family members. She considers her foster parents, who have committed to adoption, to be her "mommy and daddy." The State rested.

¶ 25       Respondent testified visits with L.C. had been going "really well." She explained that since L.C. was taken from her soon after birth, L.C. had not had a chance to bond with respondent. Respondent testified she was willing to engage in services as she had been "the entire time." She said that she and Tommy C. "make wonderful parents." Respondent asked the court for

additional time, claiming there was no domestic violence and no substance abuse issues. She said "[e]verything is, you know, great."

¶ 26　　　　After the arguments of counsel, the trial court indicated it had considered the evidence and the statutory best-interest factors. The court concluded the State had proved by a preponderance of the evidence that it was in L.C.'s best interest that respondent's parental rights be terminated.

¶ 27　　　　This appeal followed.

¶ 28　　　　　　　　　　　　　　　II. ANALYSIS

¶ 29　　　　Respondent argues the trial court erroneously terminated her parental rights because the court's fitness and best-interest determinations were both against the manifest weight of the evidence. We disagree and affirm the court's judgment.

¶ 30　　　　The Juvenile Court Act of 1987 (705 ILCS 405/1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern the termination of a parent's rights to his or her child. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). Together, the statutes outline two necessary steps in the process. The State must show the parent is an "unfit person" and that terminating parental rights serves the best interests of the child. *Id.* at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998); and the Juvenile Court Act of 1987 (705 ILCS 405/2-29(2) (West 1998)). Here, respondent challenges both determinations.

¶ 31　　　　When a parent appeals the trial court's findings that he or she is an "unfit person" and that terminating parental rights is in the best interests of the child, we do not retry the case but, instead, limit ourselves to deciding whether the court's findings are against the manifest weight of the evidence. *In re A.W.*, 231 Ill. 2d 92, 104 (2008); *In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005). This is a deferential standard of review. A finding is against the manifest weight of the evidence

only if the evidence "clearly" calls for the opposite finding (*In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072 (2006)), such that "no reasonable person" could arrive at the trial court's finding based on the evidence in the record (*Prater v. J.C. Penney Life Insurance Co.*, 155 Ill. App. 3d 696, 701 (1987)).

¶ 32        Therefore, we will begin by considering whether it is clearly evident, from the evidence in the record, that the State failed to carry its burden of proof. In other words, is it clearly evident that the State failed to prove, by clear and convincing evidence, that respondent met any one of the three definitions of an "unfit person" cited in the petition to terminate parental rights? See *In re A.J.*, 269 Ill. App. 3d 824, 828 (1994).

¶ 33                                A. Fitness Finding

¶ 34        In its petition to terminate respondent's parental rights, the State alleged that she was an "unfit person" within the meaning of section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)) in that she, *inter alia*, had failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare. In deciding whether a parent's interest in, concern for, and responsibility toward the child's welfare have been reasonable in degree, the trial court should consider the parent's efforts to visit the child and to otherwise maintain contact with the child, as well as the parent's inquiries into the child's welfare. *Daphnie E.*, 368 Ill. App. 3d at 1064. The court should consider such efforts in the circumstances in which they were made, taking into account any obstacles to visiting the child. *Id.* If circumstances make personal visitation impractical, the court should consider the extent to which the parent showed reasonable interest, concern, and responsibility by other means, such as letters, telephone calls, and gifts to the child, "taking into account the frequency and nature of those contacts." *Id.*

¶ 35        The evidence presented showed respondent stopped visiting with L.C. in April

2019 and voluntarily moved to Ohio in the fall of 2019. Her in-person visits did not resume until August 2020, well after the petition to terminate her parental rights was filed. After living in Ohio, she moved to Kentucky and later, to Missouri. She failed to engage in any of her service-plan directives and continued to maintain her relationship with Tommy C., who had serious, unresolved mental health, substance abuse, and domestic violence issues. Rather than demonstrating *any* interest in L.C.'s welfare, the evidence suggested respondent chose to disregard her parental responsibilities by (1) not visiting with L.C., (2) not working toward reunification, (3) not maintaining any contact with L.C. by sending cards or letters to her, (4) moving away from L.C., and (5) seemingly choosing a relationship with Tommy C. over one with her daughter. In fact, respondent's actions, or inactions as the case may be, showed she had no interest, concern, or responsibility toward L.C.'s welfare or toward the hope of having her child returned to her care.

¶ 36        By finding that respondent had failed to show a reasonable degree of interest, concern, or responsibility as to L.C.'s welfare, the trial court did not make a finding that was against the manifest weight of the evidence. See *A.W.*, 231 Ill. 2d at 104.

¶ 37        Because meeting only one of the statutory definitions in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) is enough to make the parent an "unfit person," we need not discuss the remaining unfitness allegations against respondent. See *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83.

¶ 38                          B. Best Interest Determination

¶ 39        Once a trial court finds a parent to be an "unfit person," it must then consider the child's best interest. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80 (stating that

once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child."
>
> *Daphnie E.*, 368 Ill. App. 3d at 1072. See also 705 ILCS 405/1-3(4.05)(a) to (j) (West 2018).

¶ 40    A reviewing court gives great deference to the trial court's decision because the trial court is in a much better position to see the witnesses and judge their credibility. *In re K.B.*, 314 Ill. App. 3d 739, 748 (2000). A court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate the court should have reached the

opposite result. *Daphnie E.*, 368 Ill. App. 3d at 1072.

¶ 41    Respondent contends the trial court ignored evidence that she had "put L.C. at the forefront of [her] decision-making and thought about her continuously." Respondent blames LCFS for interfering with her ability to bond with L.C. "by taking the child from [her] out of the hospital." Despite respondent's position, the evidence presented at the best-interest hearing demonstrated that L.C. was thriving in her relative foster home. She was receiving the care she needed, she was happy, she had a strong bond with her foster parents and siblings, and she was in a safe, secure, and stable environment. Additionally, the foster home, the only home in which she has resided, was a potential adoptive placement, lending itself to achieving the permanency, safety, and stability she deserved.

¶ 42    When analyzing the statutory best-interest factors, the trial court relied on (1) L.C.'s sense of attachments, including love, security, familiarity, and continuity of affection, and (2) L.C.'s need for permanence, including her need for stability and continuity of relationships with parent figures, with siblings, and other relatives. See *Daphnie E.*, 368 Ill. App. 3d at 1072; see also 705 ILCS 405/1-3(4.05)(d), (g) (West 2018). Because the evidence does not lead us clearly to the opposite conclusion, we find the court's best-interests determination was not against the manifest weight of the evidence. See *In re B.B.*, 386 Ill. App. 3d 686, 697-98 (2008).

¶ 43                                III. CONCLUSION

¶ 44    For the reasons stated, we affirm the trial court's judgment.

¶ 45    Affirmed.