NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210230-U

NO. 4-21-0230

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 17, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.W., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
|       Petitioner-Appellee, | ) | McLean County |
|       v. | ) | No. 18JA24 |
| Andrew W., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err in finding the termination of respondent father's
parental rights to be in the minor's best interest.

¶ 2    Respondent father, Andrew W., appeals the order terminating his parental rights

to M.W. (born May 3, 2017). Respondent contends the court's decision to terminate his parental

rights is against the manifest weight of the evidence. We affirm.

¶ 3                              I. BACKGROUND

¶ 4    Respondent and Jennifer A. are the biological parents of M.W. Jennifer A. is not a

party to this appeal.

¶ 5    In March 2018, the State filed a petition for adjudication of wardship on behalf of

M.W. Five counts of neglect were alleged. In April 2018, Jennifer A. admitted M.W. was a

neglected minor as he resided in an environment injurious to his welfare while in the care of Jennifer A. The State alleged Jennifer A. had unresolved mental health issues, creating a risk of harm to M.W. See 705 ILCS 405/2-3(1)(b) (West 2018). In finding M.W. neglected, the trial court made the following findings of fact: "Mother has had multiple psychiatric hospitalizations. She has been diagnosed with psychotic disorder (not otherwise specified). [T]here is a documented history of paranoia, delusions, anxiety, mania, and visual hallucinations. [T]his case opened in part when mother's cigarette came into contact with the minor's head, causing a burn."

¶ 6        In June 2018, the trial court entered a dispositional order finding respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline M.W. The court further found placement of M.W. with respondent to be contrary to M.W.'s health, safety, and best interest. Regarding respondent, the court ordered multiple assessments, including assessments for mental health, domestic violence, and anger management. The court further noted respondent's "extensive criminal history" and found respondent needed to demonstrate the ability to maintain a crime-free lifestyle. The court placed guardianship with the Department of Children and Family Services.

¶ 7        In June 2020, the State filed a petition to terminate respondent's parental rights. In March 2021, the State filed a first supplemental petition to terminate parental rights, alleging respondent was an unfit parent on three grounds. In April 2021, respondent stipulated the State would be able to prove him unfit on the following ground: "[Respondent] has failed to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected minor under Section 2-3 of the Juvenile Court Act of 1987, specifically being the time frame running from October 1, 2019[,] through July 1, 2020

- 2 -

[(750 ILCS 50/1(D)(m)(ii) (West 2018))]." The State provided the stipulated facts as showing respondent failed to participate in individual counseling services during the nine-month period. He also demonstrated concerning behaviors regarding anger management. In December 2019, the caseworker witnessed a phone interaction between respondent and respondent's grandmother, Karen Cook, in which respondent screamed at Karen and threatened to vandalize her home if she did not give him money. In January 2020, when respondent arrived for a visit with M.W., he "was worked up and yelling on the phone regarding his girlfriend stealing his money." In that same nine-month period, there were two domestic violence incidents with respondent's girlfriend. Respondent did not report the incidents to his caseworker. Moreover, respondent completed a parenting capacity assessment in December 2020. The psychologist opined respondent, due to his mental health, substance abuse, and criminal background, as well as the fact respondent had a legal guardian, was unlikely to ever be able to parent M.W. In February 2020, respondent was taken into federal custody on charges for conspiracy to commit underage sex trafficking.

¶ 8      The trial court found, based on the stipulation and the facts provided by the State, the State established by clear and convincing evidence respondent failed to make reasonable progress toward M.W.'s return home during the nine-month period. The court thus found respondent unfit. In so doing, the court noted, due to the presumption of innocence, respondent's arrest was not considered.

¶ 9      The hearing on the best interests of M.W. was held in April 2021. At the start of the hearing, the trial court noted it had received a best-interest report, authored by two caseworkers from The Baby Fold, and a Court Appointed Special Advocate (CASA) report.

According to the best-interest report, M.W. had resided in the same foster placement since he entered protective custody in March 2018. Respondent had been offered a minimum of weekly visits with M.W. since the case opened and respondent's arrest in February 2020. Respondent was inconsistent and unengaged in the visits. He would often not show or fail to confirm his visits, which resulted in cancellations. During in-person visits, respondent often required prompting from the worker on feeding and changing M.W. He also often fell asleep during visits. Since respondent's arrest, respondent participated in weekly video calls with M.W. Respondent was engaged during those visits.

¶ 10        The best-interest report states M.W. was a happy and healthy three-year-old who enjoyed playing with toys and spending time outside. He was up to date on medical requirements and attended an educational day care. M.W. did well in the school setting. There were no developmental concerns. M.W. shared a very strong attachment to his foster mother, Katherine W., who provided for M.W.'s needs. Katherine was willing to provide permanency for M.W.

¶ 11        Regarding respondent, the best-interest report stated he was historically uncooperative with all services recommended by The Baby Fold. Respondent completed a parenting class but failed to demonstrate appropriate and effective parenting during visits. Respondent was referred to complete a parenting capacity assessment. This was completed in December 2019. According to the assessment, respondent would be unable to parent M.W. safely. This conclusion was based on respondent's mental health concerns, criminal history, substance abuse history, and need for a legal guardian. Respondent had ongoing mental health issues that had been prevalent throughout his life. Respondent completed a mental health assessment before February 2020. It was recommended he participate in individual counseling,

which he has not done. Respondent completed a substance abuse assessment in October 2019 but was not recommended for services. Per the service plan, respondent was to complete weekly drug screens. Since July 2018, respondent completed only one. At the time of the report, respondent was in the custody of the Woodford County jail, awaiting trial for child sex-trafficking charges. Respondent had a pending motion for release, in which he was seeking house arrest with his grandmother, Karen.

¶ 12　　　The authors of the report were confident it was in M.W.'s best interest to remain in his foster home, which was the only home M.W. had known. The foster parent understood the importance of family and was willing to ensure some level of connection between M.W. and his biological family.

¶ 13　　　The recommendations in the CASA report mirror those in the best-interest report. According to the CASA report, M.W. adjusted very well to placement with his foster mother and appeared happy. M.W. was thriving with his foster mother. The reporter observed M.W. showing affection to his foster mother and receiving affection in return. He was nurtured and encouraged. The reporter opined removal from the foster parent's home "would greatly hinder his development and trust of adults."

¶ 14　　　At the hearing, Katherine, the foster mother, was the first to testify. According to Katherine, she and M.W. were the only ones who resided in her home. Katherine was a high school teacher. M.W. had been in her care since March 9, 2018. At that time, M.W. was 10 months old. The transition to her home "was bumpy at first," but M.W. did "fairly well." At the time of the testimony, he and Katherine were bonded. M.W. called Katherine "Momma." M.W. had also bonded with Katherine's nephews, who were close to M.W.'s age. During the school

year, M.W. went to day care. Katherine was willing to adopt M.W. and to foster a relationship between M.W. and his biological family. Katherine believed M.W. would be traumatized if removed from her home, as he was old enough to know that he had been removed from his home but would not fully understand why.

¶ 15 Respondent testified he was in Woodford County jail on a federal case set for trial in July 2021. He had been incarcerated since February 20, 2020. Before then, respondent visited M.W. once a week at his grandmother's house. Karen was his grandmother, M.W.'s great-grandmother. The visits lasted two hours. M.W. "was always a joy to be around." M.W. loved visiting his father and great-grandmother, and he hated to leave. Respondent agreed with the descriptions of M.W. as intelligent, funny, artistic, and happy. Respondent also described M.W. as "ornery" but "the sweetest kid [he] ever met." Respondent testified M.W. was "definitely a little me." Since his incarceration, they visited once a week over video. The visits lasted an hour and a half. During these visits, M.W. was at Karen's house. They interacted during those meetings. M.W. called respondent "Daddy." Respondent testified the two were bonded. M.W. became upset when the video visits ended. M.W. would scream, run, and hide. Respondent believed it was in M.W.'s best interest not to terminate his parental rights as M.W. would be devastated not to see him or respondent's mother and grandmother again.

¶ 16 Karen testified when M.W. was born, M.W. and respondent resided in her house. Respondent "was extremely attentive and took care of [M.W.] daily." Karen taught M.W.'s parents how to care for him. During the day, while Karen worked, respondent was the main caregiver. Jennifer A. was absent during weekdays as "[s]he was in mental[-]health court." After M.W. entered care, the visits initially took place at The Baby Fold, but they were moved to

Karen's home. At those visits, M.W. would run to the door to see respondent. Since respondent became incarcerated, M.W. continued to visit weekly at Karen's house. The visits occurred once a week for 2 hours and 20 minutes. Her requests for extended visits had been refused. The visits were not supervised. Karen arranged and paid for all the video visits with respondent. During these visits, activities were organized by Karen. For example, Karen set up the race-car set in the family room, and M.W. and respondent would talk about the cars while M.W. would physically play with them. They baked cookies together. They talked. They colored pictures at the same time. The visits were very interactive.

¶ 17    According to Karen, M.W. was bonded to respondent and to her. M.W. became very upset when it was time to leave. He would run and hide and refuse to put on his shoes. He wanted to stay. Karen testified she could provide a loving, nurturing atmosphere for M.W. She was then retired. She also had a big home and fenced-in yard as well as toys and furniture for M.W.

¶ 18    Karen did not believe respondent could independently parent M.W. on his own on a full-time basis. Respondent "always had a guardian of his adult person." Karen believed respondent could "probably with a legal guardian" of M.W. parent M.W.

¶ 19    Jennifer Brozis, respondent's mother and Karen's daughter, testified she was the guardian over respondent. When asked if the guardianship was because respondent was "in some ways disabled," Brozis testified his reading and writing were extremely limited. The guardianship was to protect respondent from people manipulating him either by signing contracts or being questioned by police. Brozis testified Karen provided a loving and nurturing environment for M.W. M.W. was excited to visit Karen.

¶ 20    In rendering his decision, the trial court stressed critical in the case was the parenting capacity assessments that were filed in January 2020. Respondent had an extensive history with substance abuse and was, at the time the assessment was completed, relying on medical marijuana. Respondent had used "other substances such as Spice." Respondent avoided individual therapy due to the report of experiencing flashbacks. Respondent received Supplemental Security Income, commonly known as SSI, based on his mental health history and learning disabilities. Respondent was unable to maintain full-time employment. Respondent had a criminal record which included convictions for aggravated battery.

¶ 21    The trial court then weighed the statutory factors for a best-interest determination. The court found the factor of physical safety and welfare of M.W. weighed in favor of termination. The court concluded the parents lacked the capacity to parent independently and to provide for M.W.'s day-to-day needs, while Katherine had been providing for those needs. The court found the child's identity weighed in favor of termination, as Katherine was the primary caregiver and had been primarily involved in developing M.W.'s identity. As to the factor of the child's background and ties, the court found the factor neutral, finding M.W. had bonded both to his biological family and his foster placement and had ties to each. As to the child's sense of attachments, the court found this factor neutral, concluding M.W. "ha[d] love and an attachment with everyone who ha[d] his hands on him so to speak." As to M.W.'s sense of security, the court found that factor weighed in favor of termination, as he had been in Katherine's home for the three years. The continuity of affection also weighed toward termination. The court noted everyone adored M.W. but the continuity of affection was with Katherine. According to the court, the least disruptive placement was to remain with Katherine. Community ties weighed

toward termination, as M.W. had a routine while in foster care. He went to day care and spent his summers with Katherine. A neutral factor was the uniqueness of every family and child. The risks-for-substitute-care factor favored termination, as there was too much uncertainty in leaving M.W. in substitute care. The court further found the factors of preferences of those available to care for the child and permanence both favored termination. The court concluded it was in M.W.'s best interest that the parental rights of respondent be terminated.

¶ 22       This appeal followed.

¶ 23                             II. ANALYSIS

¶ 24       Respondent contends the trial court erred in terminating his parental rights. Respondent maintains the court erred by not appropriately weighing the statutory best-interest factors. Respondent challenges the court's findings related to M.W.'s sense of attachments, the continuity and consistency of affections, M.W.'s wishes and long-term goals, and the risks attendant to remaining in substitute care.

¶ 25       Upon a finding of parental unfitness, a hearing on a child's best interest will be held. At the best-interest hearing, the trial court's focus shifts to the child's interest in securing "a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). When a best-interest decision must be made, the court shall consider factors listed in section 1-3 of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018)). These factors include the child's physical safety and welfare, the development of the child's identity, the child's background and ties, the child's sense of attachments including the sense of security, familiarity, and continuity of affection, the child's wishes and long-term goals, and the preferences of those available to care for the child. *Id.* A parent's wishes to continue his relationship with his child

yields to the child's interests. *D.T.*, 212 Ill. 2d at 364.

¶ 26        The trial court may terminate parental rights only upon finding the State proved, by a preponderance of the evidence, the termination of those rights is in the child's best interest. *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). We will not disturb a best-interest determination unless it is against the manifest weight of the evidence. *Id.* A best-interest determination is against the manifest weight of the evidence only if it is clearly evident the State failed to carry its burden of proof or, in other words, if the finding is "unreasonable, arbitrary, or not based on the evidence presented." *In re J.H.*, 2020 IL App (4th) 200150, ¶ 85, 162 N.E.3d 454 (quoting *In re B.B.*, 386 Ill. App. 3d 686, 697-98, 899 N.E.2d 469, 480 (2008)).

¶ 27        Upon our review of the record, including the trial court's weighing the statutory factors, we find the trial court's best-interest determination is not against the manifest weight of the evidence. At the conclusion of the best-interests hearing, the trial court plainly listed and considered the statutory factors of section 1-3(4.05) (705 ILCS 405/1-3(4.05) (West 2018)). The court found multiple factors were neutral or weighed in favor of termination. Regarding the child's sense of attachment (*id.* § 1-3(4.05)(d)), the court found this factor "neutral." While respondent emphasizes M.W.'s attachments to him and to M.W.'s grandmother and great-grandmother, the record shows M.W.'s attachment to Katherine, with whom M.W. spent nearly three-quarters of his life and shared a loving bond, was also strong. As to the continuity-and-consistency-of-affection factor (*id.* § 1-3(4.05)(g)), given the evidence establishing M.W. was thriving in his foster-care placement, where he had spent nearly three-quarters of his life, there is no error in weighing this factor toward termination. The record

- 10 -

shows stability and consistency could not, in the foreseeable future, be provided should respondent retain his parental rights.

¶ 28       We further find respondent's contentions regarding the other factors similarly do not show the trial court's decision was arbitrary, unreasonable, or not based on the evidence. Although the evidence shows M.W. enjoyed visits with his great-grandmother and his father and expressed displeasure when those visits ended, M.W. was thriving in his foster placement. Katherine offered permanency and stability and provided for all of his needs. M.W. was safe, and his foster home was the only home he knew. There is no error in the trial court's decision.

¶ 29                              III. CONCLUSION

¶ 30       We affirm the trial court's judgment.

¶ 31       Affirmed.