NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210278-U

NO. 4-21-0278

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 22, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.W., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
|       Petitioner-Appellee, | ) | McLean County |
|       v. | ) | No. 18JA24 |
| Jennifer A., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1 *Held*: The trial court did not err in finding the termination of respondent mother's
parental rights to be in the minor's best interest.

¶ 2  Respondent mother, Jennifer A., appeals the order terminating her parental rights
to M.W. (born May 3, 2017). Respondent contends the court's decision to terminate her parental
rights is against the manifest weight of the evidence. We affirm.

¶ 3          I. BACKGROUND

¶ 4  Respondent and Andrew W. are the biological parents of M.W. Andrew W. is not
a party to this appeal.

¶ 5  In March 2018, the State filed a petition for adjudication of wardship on behalf of
M.W., alleging five counts of neglect. In April 2018, respondent admitted M.W. was a neglected

minor as he resided in an environment injurious to his welfare while in her care. The State alleged respondent had unresolved mental health issues, creating a risk of harm to M.W. See 705 ILCS 405/2-3(1)(b) (West 2018). In finding M.W. to be a neglected minor, the trial court made the following factual findings: "[Respondent] has had multiple psychiatric hospitalizations. She has been diagnosed with psychotic disorder (not otherwise specified). [T]here is a documented history of paranoia, delusions, anxiety, mania, and visual hallucinations. [T]his case opened in part when [respondent's] cigarette came into contact with the minor's head, causing a burn."

¶ 6    In June 2018, the trial court entered a dispositional order finding respondent unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline M.W. The court further found placement of M.W. with respondent to be contrary to M.W.'s health, safety, and best interest. Regarding respondent, the court ordered she complete assessments for parenting capacity, domestic violence, and substance abuse. The court further found respondent's relationship with Andrew W. needed to be defined. The court placed guardianship of M.W. with the Department of Children and Family Services (DCFS).

¶ 7    In June 2020, the State filed a petition to terminate the parental rights of respondent and Andrew W. As to respondent, the State alleged she was an unfit parent on three grounds. In March 2021, respondent admitted being an unfit parent based on the following ground: "[Respondent] has failed to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected minor under Section 2-3 of the Juvenile Court Act of 1987, specifically being the time frame running from October 30, 2018[,] through July 30, 2019 [(750 ILCS 50/1(D)(m)(ii) (West 2018))]."

¶ 8    The State provided a factual basis for respondent's admission to parental

unfitness. According to the State, its evidence would establish respondent had a long history of mental health issues, which was the basis for the neglect adjudication. While respondent cooperated with the caseworker and services, respondent made no progress toward stabilizing her mental health. Respondent continued to suffer from significant psychiatric episodes and was hospitalized from November 28, 2018, to December 12, 2018. She suffered visual and auditory hallucinations and stated she would be scared for M.W. if he were present when one of those psychiatric episodes occurred. Respondent failed to obtain and maintain a stable legal source of income. She relied on her mother's support with housing and finances.

¶ 9        The trial court accepted respondent's admission and found respondent unfit.

¶ 10        In April 2021, the trial court conducted a hearing to determine whether it was in the best interest of M.W. to terminate respondent's parental rights. The trial court initially noted it received a best-interest report, authored by The Baby Fold, and a court appointed special advocate (CASA) report. According to the best-interest report, M.W. had resided in the same foster placement since he entered protective custody in March 2018. Respondent had been offered a minimum of weekly visits with M.W. since the case opened. She was consistent with visits, but the authors of the report opined respondent appeared "to lack a bond with her son." Respondent demonstrated frustration when basic parenting duties needed done. She had "an irritated tone in her voice" and disengaged when M.W. was difficult to deal with. Respondent "had displayed minimal interaction with her son, by lying in bed, leaving several times, spending a considerable amount of time watching [television,] and ending visitation early."

¶ 11        According to the report, M.W. was a happy and healthy three-year-old who enjoyed playing with toys and spending time outside. He was up to date on medical requirements

and attended an educational daycare. M.W. did well in the school setting. There were no developmental concerns. M.W. shared a very strong attachment to his foster mother, Katherine W., who provided for M.W.'s needs. Katherine was willing to provide permanency for M.W.

¶ 12        As to respondent, the best-interest report indicated she began receiving services through The Baby Fold in March 2018. Respondent successfully completed a parenting class, and she had been engaged with a parent coach through Children's Home and Aid. Although she completed the parenting class, The Baby Fold continued to have concerns regarding respondent's ability to parent M.W. safely. Because of these concerns, respondent was asked to complete a parenting capacity assessment, which she did in December 2019. According to the assessment, "it [was] unlikely" respondent would be able to parent M.W. safely as he developed because of her significant mental health diagnosis, the absence of a connection between M.W. and her, and a lack of engagement. "More recently," respondent canceled visits, ended visits early, and laid in bed during visits. Respondent was subsequently referred to a parenting coach through The Baby Fold. She had not been cooperating in meeting with the worker and had not begun the program. Respondent canceled sessions, stating "it's a little too late" to begin treatment. Regarding respondent's mental health, respondent was diagnosed with schizoaffective disorder. She attended counseling consistently and reported no visual or auditory hallucinations in over a year. Respondent failed to complete drug screenings since September 30, 2020.

¶ 13        The Baby Fold opined it was in M.W.'s best interest to remain with his foster mother, who provided him the only home M.W. had known. The foster mother understood the importance of family and was willing to ensure some level of connection between M.W. and his biological family.

¶ 14        The CASA report recommended the same. According to the CASA report, M.W. adjusted very well to placement with his foster mother and appeared happy. He thrived in the care of his foster mother. The reporter observed M.W. showing affection to his foster mother and receiving affection in return. He was nurtured and encouraged. The reporter opined removal from the foster parent's home "would greatly hinder his development and trust of adults."

¶ 15        At the hearing, Katherine, the foster mother, was the first to testify. According to Katherine, she and M.W. were the only ones who resided in her home. Katherine was a high school teacher. M.W. had been in her care since March 9, 2018. At that time, M.W. was 10 months old. The transition to her home "was bumpy at first," but M.W. did "fairly well." At the time of the testimony, he and Katherine were bonded. M.W. called Katherine "Momma." M.W. had also bonded with Katherine's nephews, who were close to M.W.'s age. During the school year, M.W. went to day care. Katherine was willing to adopt M.W. and to foster a relationship between M.W. and his biological family. Katherine believed M.W. would be traumatized if removed from her home, as he was old enough to know that he had been removed from his home but would not fully understand why.

¶ 16        Respondent testified she and M.W. had "an open relationship." They were loving and had fun together. M.W. called respondent "Mommy." M.W. was creative and was a "really good artist." They created art and went outside together. M.W. liked Legos and board games. During their visits, food was always available for him. He liked chicken nuggets, macaroni and cheese, and pizza. When asked if she was ready for M.W. to reside with her full-time, respondent testified she was "emotionally and mentally and physically" ready but stated she would have to get a few things, like furniture and clothing, in place first. Respondent believed she was able to

parent M.W. full-time and M.W. belonged with his birth mother and his family.

¶ 17        Respondent acknowledged the longest visits she had with M.W. were six hours, once each week. She also acknowledged she had no issues with the care Katherine provided M.W. Respondent knew M.W. was safe, secure, and happy while in Katherine's care. Katherine updated respondent on milestones and provided photos.

¶ 18        Respondent further testified she had a parenting coach who helped her until M.W. turned three. The Baby Fold offered additional one-on-one coaching for parenting, but she had difficulty meeting up with the coach: "Something happened on her end or would happen on my end, and then I thought that, you know, this wouldn't go on this long. And I said if it's, you know, almost over, I don't really feel like I need a parenting coach, but, if it's going to be longer, I can still get one." Respondent had not met with the parenting coach since early January 2021.

¶ 19        In rendering its decision, the trial court found the parenting capacity assessments, filed in January 2020, to be critical in the case. The court noted it had reviewed the assessments and found them to be "very detailed." Regarding respondent, the court noted the assessment revealed she had a history of substance abuse. The assessment referenced concerns about respondent's violent behaviors "that could resurface." The assessment also indicated concerns about respondent's ability to parent independently and about the bond between respondent and M.W.

¶ 20        The trial court then weighed the statutory factors for a best-interest determination. The court found the factor of physical safety and welfare of M.W. weighed in favor of termination. The court concluded the biological parents lacked the capacity to parent independently and to provide for M.W.'s day-to-day needs, while Katherine had been providing

for those needs. The court found the child's identity weighed in favor of termination, as Katherine was the primary caregiver and had been primarily involved in developing M.W.'s identity. As to the factor of the child's background and ties, the court found the factor neutral, finding M.W. had bonded both to his biological family and his foster placement and had ties to each. As to the child's sense of attachments, the court found this factor neutral, concluding M.W. "ha[d] love and an attachment with everyone who ha[d] his hands on him so to speak." As to M.W.'s sense of security, the court found that factor weighed in favor of termination, as he had been in Katherine's home for three years. The continuity of affection also weighed toward termination. The court noted everyone adored M.W. but the continuity of affection was with Katherine. According to the court, the least disruptive placement was to remain with Katherine. Community ties weighed toward termination, as M.W. had a routine while in foster care. He went to day care and spent his summers with Katherine. A neutral factor was the uniqueness of every family and child. The risks-for-substitute-care factor favored termination, as there was too much uncertainty in leaving M.W. in substitute care. The court further found the factors of preferences of those available to care for the child and permanence both favored termination. The court concluded it was in M.W.'s best interest that respondent's parental rights be terminated.

¶ 21        This appeal followed.

¶ 22                              II. ANALYSIS

¶ 23        Respondent contends the trial court's decision to terminate her parental rights is against the manifest weight of the evidence. Respondent argues the court placed excessive weight on the sense-of-security and continuity-of-affection factors as, given the time that had

passed from when M.W. entered into care because of the COVID-19 pandemic and DCFS limitations, those factors skewed toward the foster placement. Respondent further maintains too much weight was given to the need for permanence for M.W. with placement with Katherine because respondent's ongoing progress mitigated adoption as an option. Moreover, respondent contends the court gave insufficient weight to M.W.'s relationship with respondent.

¶ 24     Upon a finding of parental unfitness, the proceedings move to a best interest hearing. At the best-interest hearing, the trial court's focus shifts to the child's interest in securing "a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). When a best-interest decision must be made, the court shall consider factors listed in section 1-3 of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2018)). These factors include the child's physical safety and welfare, the development of the child's identity, the child's background and ties, the child's sense of attachments including the sense of security, familiarity, and continuity of affection, the child's wishes and long-term goals, and the preferences of those available to care for the child. *Id.* A parent's wishes to continue the relationship with the child yields to the child's interests. *D.T.*, 212 Ill. 2d at 364.

¶ 25     The trial court may terminate parental rights only upon finding the State proved, by a preponderance of the evidence, the termination of those rights is in the child's best interest. *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). We will not disturb a best-interest determination unless it is against the manifest weight of the evidence. *Id.* A best-interest determination is against the manifest weight of the evidence only if it is clearly evident the State failed to carry its burden of proof or, in other words, if the finding is "unreasonable, arbitrary, or not based on the evidence presented." *In re J.H.*, 2020 IL App (4th)

- 8 -

200150, ¶ 85, 162 N.E.3d 454 (quoting *In re B.B.*, 386 Ill. App. 3d 686, 697-98, 899 N.E.2d 469, 480 (2008)).

¶ 26 Upon reviewing the trial court's decision and the record, we find the trial court's best-interest determination was not against the manifest weight of the evidence. The court expressly considered the statutory factors of section 1-3(4.05) (705 ILCS 405/1-3(4.05) (West 2018)). While respondent testified to a bond she shared with M.W., the record shows concerns about that bond. In contrast, there were no concerns or issues about the bond M.W. shared with Katherine, with whom he lived for three quarters of his life. We are also not convinced the fact that COVID-19 and DCFS may have contributed to a lengthier time between M.W.'s entering care and the filing of the petition to terminate parental rights has any bearing on the best-interest determination. The law plainly establishes at this stage, where parental unfitness has already been found, the best interest of the child is the priority. *D.T.*, 212 Ill. 2d at 364. The evidence established M.W. was thriving in his foster placement, shared a strong bond with his foster mother, and had ties to his foster mother's family, friends, and community. The evidence also showed respondent could not provide M.W. with a stable and secure environment in the foreseeable future. Based on the foregoing, the court's decision to terminate respondent's parental rights is not unreasonable or arbitrary or contrary to the manifest weight of the evidence.

¶ 27                                III. CONCLUSION

¶ 28          We affirm the trial court's judgment.

¶ 29          Affirmed.