NOTICE
Decision filed 09/22/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250341-U

NOS. 5-25-0341, 5-25-0342, 5-25-0343 cons.

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| *In re* MOLLY M., CAEDYN M., and CALLAN M., Minors | Appeal from the Circuit Court of Saline County. |
| (The People of the State of Illinois, | |
| Petitioner-Appellee, | |
| v. | Nos. 22-JA-30, 22-JA-31, 23-JA-11 |
| Alexandria W., | Honorable Amanda Byassee Gott, |
| Respondent-Appellant). | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Cates and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court did not err in finding the respondent unfit and the respondent's counsel did not render ineffective assistance.

¶ 2    Following a termination hearing, the circuit court of Saline County found the respondent unfit and terminated her parental rights. On appeal, the respondent claims the circuit court erred by finding her unfit and that counsel's failure to object to the admissions of four permanency reports constituted ineffective assistance. We affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4    The events leading to this appeal began on June 28, 2022, when the State filed two petitions[1] of adjudication, one on behalf of Molly in Saline County case No. 22-JA-30, and one on behalf of Callan in Saline County case No. 22-JA-31. In each petition, the State alleged that Molly and Callan were abused pursuant to section 2-3(2)(i) and (ii) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(2)(i), (ii) (West 2020)), in that the respondent created substantial risk of physical injury to them by other than accidental means, which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function. As factual support, the petitions alleged that in June of 2022, the Department of Children and Family Services (DCFS) investigated a domestic violence incident after a law enforcement deputy reported hearing children[2] scream, "stop your [*sic*] hurting me" while outside of the respondent's home. DCFS took the children to the emergency room, where they were found with bruises at various stages of healing.

¶ 5    Additionally, the petitions alleged that Molly and Callan were neglected because they were in an environment injurious to their welfare. See *id.* § 2-3(1)(b). As support, the petitions alleged facts regarding, *inter alia*, a May 2022 investigation by DCFS into allegations of sexual abuse against one of the children[3] by a family or household member of the respondent. During the investigation, DCFS attempted to mitigate the risk to the respondent's children by asking the

---

[1]The record shows that at this time, the respondent had four children, with separate petitions filed for each, alleging the same facts. The respondent's other children are not subject to this appeal and are discussed only when necessary.

[2]The petitions did not specify which child screamed or sustained the referenced injuries.

[3]The petitions did not specify which child was allegedly abused nor the alleged perpetrator(s).

respondent to keep them away from her paramour.[4] The respondent obtained an order of protection against her paramour; however, she continued to allow him access to the children.

¶ 6     On September 1, 2022, a service plan, dated August 5, 2022, was filed in both cases. The plan indicated the respondent needed to (1) complete a substance abuse, mental health, and domestic violence assessment; (2) successfully complete parenting classes; (3) demonstrate skills learned in parenting classes; (4) attend all scheduled visits with her children; (5) cooperate with DCFS; and (6) follow all recommendations. The plan recommended a permanency goal of return home within 12 months in order to allow the respondent "to correct the conditions which brought the child[ren] into care."

¶ 7     On October 18, 2022, the Circuit Court Appointed Special Advocates (CASA) of Saline County was appointed to act as the children's guardian *ad litem*. That same day, the circuit court conducted an adjudicatory hearing in both cases. At the beginning of the hearing, it was announced that the respondent would be stipulating to the allegations in the State's petitions. The circuit court accepted the respondent's stipulation and entered an adjudicatory order finding that Molly and Callan were abused and neglected.

¶ 8     A dispositional hearing was held in both cases on November 15, 2022. At the conclusion of the hearing, the circuit court found the respondent unfit and unable to care for, protect, train, educate, supervise, or discipline Molly and Callan due to domestic incidents and substance abuse issues. The circuit court then adjudged Molly and Callan wards of the court, determining it to be in their best interest and welfare. The circuit court then admonished the respondent that she risked termination of her parental rights if she failed to cooperate with DCFS, comply with the service plan, and correct the conditions which required Molly and Callan to be in care.

---

[4]A review of the record reveals that her paramour is the father of Molly, Callan, and Caedyn, Thomas M., who is not a party to this appeal.

¶ 9    On March 8, 2023, the respondent gave birth to Caedyn. On March 10, 2023, the State filed a petition for adjudication of wardship in Jefferson County. The petition alleged Caedyn was neglected due to the respondent's ongoing alcohol and substance abuse issues, previous involvement with DCFS, and because the respondent had two other children, Molly and Callan, in the custody of DCFS. That same day, the Jefferson County circuit court found probable cause to exist that Caedyn was neglected. As a result, Caedyn was immediately removed from the respondent's custody and temporarily placed in the custody of DCFS.

¶ 10    On May 22, 2023, the Jefferson County circuit court determined Caedyn to be neglected. At the dispositional hearing, the Jefferson County circuit court found the respondent to be unable, for reasons other than financial circumstances alone, to care for, protect, train, supervise, or discipline Caedyn and that placement with the respondent was contrary to his health, safety, and best interest. Custody of Caedyn remained with DCFS. On August 14, 2023, the Jefferson County circuit court transferred the case to the Juvenile Division of the circuit court of Saline County.

¶ 11    In January of 2024, a permanency hearing report was filed in all three cases. The report indicated, *inter alia*, the respondent had completed a mental health assessment and substance abuse counseling. Despite completing substance abuse counseling, the respondent tested positive for amphetamines and tetrahydrocannabinol (THC) in July 2023. Additionally, the respondent tested positive for alcohol following a random drug screening in August 2023. On December 12, 2023, the respondent was reportedly ordered to complete a drug screening and refused. The report indicated the respondent had not been in contact with DCFS since.

¶ 12    On February 13, 2024, the circuit court entered a written permanency order, in all three cases, finding that the respondent had made reasonable efforts but not reasonable progress. The order indicated a "return home goal" of 12 months for Molly, Callan, and Caedyn because the

4

respondent did not complete services and refused court-ordered drug testing. Again, the circuit court admonished the respondent that she risked termination of her parental rights if she failed to cooperate with DCFS, comply with the service plan, and correct the conditions which required Molly, Callan, and Caedyn to be in care.

¶ 13 On April 25, 2024, a family service plan was filed in all three cases. The plan noted the respondent was "making some progress in completing services but not utilizing the tools." Therefore, the plan indicated the respondent needed to, *inter alia*, (1) complete a substance abuse and mental health assessment; (2) "achieve and maintain an alcohol/drug free level of personal functioning"; (3) attend all scheduled visits with the minors; (4) cooperate with DCFS; and (5) follow all recommendations. The plan recommended a permanency goal of return home within 12 months in order to allow the respondent "to correct the conditions which brought the child[ren] into care."

¶ 14 On May 7, 2024, CASA filed a report in all three cases. The CASA report indicated the respondent had tested positive for benzodiazepines and alcohol. Following a permanency hearing on May 14, 2024, the circuit court entered a written order, finding that the respondent had made reasonable efforts but not reasonable progress, noting the respondent's failure to complete services, in addition to the respondent's involvement with alcohol, drug use, and her refusal of drug testing.

¶ 15 In July of 2024, a permanency report was filed in all three cases. The report indicated, *inter alia*, that the respondent tested positive for alcohol on March 25, 2024, and missed drug screenings on April 16, 2024, July 11, 2024, and July 19, 2024. Notably, the report indicated the respondent admitted to consuming alcohol and using methamphetamine during her pregnancy with Caedyn.

5

¶ 16    On August 19, 2024, a police report was filed in Molly and Callan's cases. The report indicated that on August 18, 2024, Harrisburg police officers were dispatched to a residence in response to a possible home invasion involving the respondent. Upon arrival, the reporting officer observed the respondent lying unresponsive in the yard. The officer spoke to witnesses, who relayed that the respondent came to the residence uninvited and intoxicated. The respondent reportedly became violent and hit one witness in the face and the other in the chest. As the witnesses were speaking to the reporting officer, the respondent became responsive. As the reporting officer helped the respondent off the ground, the officer smelled a strong odor of alcohol. When questioned by emergency service personnel about whether she had been drinking, the respondent stated that she had two beers. The respondent was then reportedly transported to the hospital, where she ripped out her intravenous transfusions and walked out of the facility. Hospital staff contacted the reporting officer, who later eventually placed the respondent in custody and transported her to the Saline County Detention Center.

¶ 17    A report was filed in all three cases on September 4, 2024. The report observed the police report filed on August 19, 2024, and noted that the respondent was charged with aggravated battery and trespassing. Additionally, the report noted the respondent was intoxicated at the time of incident.

¶ 18    On September 10, 2024, the circuit court conducted a permanency hearing in all three cases. During the hearing, Nathan Smith, a caseworker for Lutheran Social Services of Illinois (LSSI), testified that he was the respondent's current caseworker. Smith testified that the respondent was to be reenrolled in services following the incident on August 18, 2024. Additionally, Smith testified the respondent reenrolled in substance abuse services after testing positive for alcohol on September 9, 2024.

¶ 19    Following Smith's testimony, the circuit court entered a written permanency order, finding that the respondent had made reasonable efforts but had not made reasonable progress. The order set a 12-month "return home goal" for Molly, Callan, and Caedyn because "services ha[d] not been completed to correct the conditions that brough [Molly, Callan, and Caedyn] into care." Again, the circuit court admonished the respondent that she risked termination of her parental rights if she failed to cooperate with DCFS, comply with the service plan, and correct the conditions which required Molly, Callan, and Caedyn to be in care.

¶ 20    In November of 2024, a permanency hearing report was filed in all three cases. The report indicated the respondent was rated unsatisfactory because she had failed to complete or comply with any service program. Specifically, the report indicated, *inter alia*, that the respondent failed to appear for drug screening on August 16, 2024, September 6, 2024, and October 11, 2024. However, on September 9, 2024, the respondent tested positive for alcohol. Additionally, the respondent had not reenrolled in substance abuse treatment, parenting, or domestic violence services. The report recommended the permanency goal be changed to substitute care pending termination of parental rights because the respondent had yet to correct the conditions that brought the minors into care, "despite having 2+years to demonstrate improvement."

¶ 21    On November 26, 2024, the circuit court conducted a permanency hearing. At the conclusion of the hearing, the circuit court ruled the permanency goal was substitute care pending termination of parental rights, noting that the respondent had not made reasonable efforts or progress because she had not completed services and continued to abuse substances. The circuit court entered an order to that effect. The circuit court also, and again, admonished the respondent that she risked termination of her parental rights if she failed to cooperate with DCFS, comply with

7

the service plan, and correct the conditions which required Molly, Callan, and Caedyn to be in care.

¶ 22    On January 13, 2025, the State filed a motion for termination of parental rights and for adoption of guardianship with power to consent to adoption in all three cases. The State alleged the respondent was unfit under section 1(D) of the Adoption Act for, *inter alia*, failure to make reasonable progress towards Molly, Callan, and Caedyn's return within several nine-month periods following the adjudication of abuse or neglect under section 2-3 of the Juvenile Court Act. See 750 ILCS 50/1(D)(m)(ii) (West 2020).

¶ 23    On January 22, 2025, a permanency report was filed in all three cases. The report indicated the respondent was rated unsatisfactory because she had failed to complete or comply with any service program. The report indicated, *inter alia*, the respondent had "been unable to demonstrate 6 consecutive months of sobriety," as the respondent tested positive for substances on November 18, 2024, and admitted to consuming alcohol. Additionally, the respondent failed to appear for drug screening on November 22, 2024, December 5, 2024, and January 17, 2025. The respondent allegedly informed the agency that she was not going to attend the January 17, 2025, screening by texting the agency, "Not going we're done doing business with you. You have made it clear that all you want us to do [*sic*] these bullshit classes and trips to Marion while robbing us of our children's rights. We're done with it." At the time of the report's filing, the respondent had attended one drug screening since July of 2024. Further, it was reported that the respondent had not reenrolled in domestic violence services. The respondent had previously reported that she was on the wait list for domestic violence services, "but there [was] no verification of [her] claim."

¶ 24    On April 1, 2025, the circuit court conducted a fitness hearing in all three cases. The respondent was present in person and represented by counsel. The State called Smith as its first

8

witness. Smith testified that in June of 2022, Molly and Callan came into care due to, *inter alia*, concerns of domestic violence and substance abuse. Smith testified that Caedyn came into care in March of 2023 "due to substance abuse on behalf of the [respondent]." However, Smith testified that he did not become involved in this matter until June of 2024.

¶ 25    The State then presented Smith with Petitioner's Exhibit No. 1, 2, 3, and 4. Smith identified the exhibits[5] as permanency reports that he had written. Each exhibit was admitted into evidence without objection. At the time of each report, Smith was not recommending that the respondent had made reasonable progress during the reporting period because she had failed to complete or comply with any service program.

¶ 26    Smith also identified Petitioner's Exhibit No. 12, a family service plan dated December 3, 2024, that he had created, and it was admitted without objection. Petitioner's Exhibit No. 12 contained the respondent's rated service tasks for September to December 2024. Smith testified that the respondent was deemed unsatisfactory. A review of Petitioner's Exhibit 12 reveals that the respondent's permanency goal was changed to substitute care pending termination of parental rights due to respondent's lack of progress. Smith testified that he provided the respondent with copies of the service plan and recalled her disagreeing with it.

¶ 27    Additionally, Smith testified that he reviewed the report and service plans that had been created prior to being assigned the respondent's case. In providing the following testimony, Smith had to refer to his notes. No objection was made to Smith referring to his notes. Smith testified that initially, the respondent "was recommended for domestic violence services, parenting services, mental health services, substance abuse services and cooperation." Of those services,

---

[5]Petitioner's Exhibit No. 1 was a permanency report that was filed with the court on March 8, 2025. Petitioner's Exhibit No. 2 was the January 22, 2025, permanency report. Petitioner's Exhibit No. 3 was the November 13, 2024, permanency report. Lastly, Petitioner's Exhibit No. 4 was the July 30, 2024, permanency report.

9

Smith specified the respondent "was satisfactory at one point or another. She has, however, not been satisfactory through the length of the case on substance abuse, cooperation, personal hygiene, employment/income, housing/environment."

¶ 28    Smith testified that the initial integrated assessment was created in 2022 and was later updated. The updated service plan again recommended, *inter alia*, mental health, substance abuse, domestic violence, and parenting education services. Smith testified he was in contact with the respondent's service providers and noted the respondent was on the wait list for domestic violence services, as she was "re-referred" following the August 18, 2024, incident. Additionally, Smith testified that the respondent continued to attend mental health and substance abuse services and was advised by service providers to take part in an intensive in-patient rehabilitation program.

¶ 29    When asked if the respondent had completed any services that were recommended to correct the conditions that brought Molly, Callan, and Caedyn into care, Smith testified that she had not. Smith testified that "substance abuse and domestic violence were the primary concerns for [the respondent]." Smith testified that he could not recommend the return of Molly, Callan, and Caedyn to the respondent because she had not made reasonable efforts or progress.

¶ 30    On cross-examination, Smith confirmed that at some point, the respondent was rated satisfactory for the service of domestic violence. After the August 18, 2024, incident, Smith confirmed that he "re-referred" the respondent for services. Smith confirmed the respondent was enrolled in mental health services and provided "some participation." Smith was unable to confirm if the respondent was taking medication for her substance abuse problems as he had yet to request her medical records.

¶ 31    During redirect examination, the State asked the circuit court to take judicial notice of the permanency orders filed on February 13, 2024, May 14, 2024, September 10, 2024, and November

26, 2024. Having asserted that none of the other attorneys had any objection, the court granted the State's request, taking judicial notice of the permanency orders.

¶ 32 The respondent then testified on her own behalf. At the time of her testimony, the respondent was unemployed. The respondent had applied for a job at Dollar General in February and was waiting to hear back from the employer.

¶ 33 The respondent testified that she completed 10 weeks of parenting classes during rehab and while pregnant with Caedyn. The respondent testified that she had been attending mental health and substance abuse classes since March 2023, although she testified that she had "a hiccup a couple months ago," and indicated various reasons why she did not attend her mental health and substance abuse counseling services.

¶ 34 In December 2024, the respondent testified she was prescribed medication for her substance abuse issues and acknowledged the severity of her problem. The respondent testified she had completed a drug screening in March, testifying that "there was a light—a light thing on the alcohol line," which she attributed to consuming wine at church. Nevertheless, the respondent testified that she was proud of herself for how her "substance abuse treatment was coming," and attributed her success to the prescription medication.

¶ 35 Additionally, the respondent testified that she was referred to domestic violence services in December of 2024. The respondent testified that she had previously completed domestic violence services and did not understand why she needed to repeat them. Despite this, the responded testified that she would complete domestic violence services "a million more times."

¶ 36 On cross-examination, the respondent confirmed she had not reengaged in domestic violence services. The respondent testified that based on her rehabilitation efforts, she believed she was compliant with substance abuse and health services.

11

¶ 37    After hearing the evidence presented, the circuit court determined the State had sufficiently proven that the respondent was unfit for failing to make reasonable efforts or progress towards the return of Molly, Callan, and Caedyn during "several different nine-month periods." In making its findings, the circuit court specifically stated that it considered, *inter alia*, the testimony and evidence that had been presented, "the permanency orders, as well as the adjudicatory orders and the dispositional orders that were entered in this case." Specifically, the circuit court noted the respondent's issues with domestic violence and substance abuse, which led to Molly, Callan, and Caedyn to be taken into care. Additionally, the court observed the permanency orders and reports, highlighting that the respondent had not yet completed a service plan. Although the circuit court acknowledged the respondent's efforts in substance abuse treatment, the court emphasized that substance abuse remained a significant concern. The circuit court described the respondent's history with substance abuse as "lengthy," involving episodes of relapse, failed drug tests, and refusals to take drug tests.

¶ 38    The circuit court then proceeded to a best interest hearing that same day. Following the best interest hearing, the circuit court entered a written order finding that it was in the best interest of Molly, Callan, and Caedyn that the respondent's parental rights be terminated. The respondent filed timely notices of appeal in all three cases, and this court consolidated the three cases for purposes of appeal.

¶ 39                                    II. ANALYSIS

¶ 40    We begin our analysis by noting the respondent does not challenge the circuit court's best interest determination in her opening brief before this court. Since the respondent does not challenge the best interest determination in her opening brief, this issue is waived. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

12

¶ 41    On appeal, the respondent instead challenges the circuit court's finding of unfitness. The respondent argues the circuit court's finding of unfitness was against the manifest weight of the evidence because "at the unfitness hearing, the State only produced one witness, whose evidence was very sparce and limited as to the services of the mother." The respondent further argues the State "was relying upon the permanency reports to back-door much of their evidence in without the necessity of calling other witnesses to testify about the [respondent's] services." We disagree.

¶ 42    In general, termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2020). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). Notably, when the circuit court makes a finding of unfitness under one ground, we may affirm that finding of unfitness regardless of the circuit court's findings with respect to any other ground asserted in the State's petition or motion. See 750 ILCS 50/1(D) (West 2020).

¶ 43    Therefore, we solely focus on the finding of unfitness in this appeal based upon section 1(D)(m)(ii), which states:

> "(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act. If a service plan has been established as required under

13

Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987. Notwithstanding any other provision, when a petition or motion seeks to terminate parental rights on the basis of item (ii) of this subsection (m), the petitioner shall file with the court and serve on the parties a pleading that specifies the 9-month period or periods relied on. The pleading shall be filed and served on the parties no later than 3 weeks before the date set by the court for closure of discovery, and the allegations in the pleading shall be treated as incorporated into the petition or motion. Failure of a respondent to file a written denial of the allegations in the pleading shall not be treated as an admission that the allegations are true." *Id.* § 1(D)(m)(ii).

¶ 44    " 'Reasonable progress' is an objective standard and is based upon the amount of progress as measured from the conditions existing at the time of removal." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 37. The circuit court may conclude that a parent has made reasonable progress when it can conclude that the minor child will be able to return to parental custody in the near future. *Id.* Additionally, only evidence occurring during the relevant nine-month periods specified in the petition or motion to terminate parental rights pursuant to section 1(D)(m)(ii) may be considered by the circuit court when determining whether reasonable progress was made. *In re J.L.*, 236 Ill. 2d at 341.

¶ 45    On appeal, a finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Indeed, "[a] reviewing court *** must not substitute its judgment for that of the [circuit] court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *In re B.B.*, 386 Ill. App. 3d 686, 698 (2008). For that reason, this court will not reweigh the evidence or reassess the credibility of Smith. Regarding all its findings and conclusions, the circuit court was in the best position to make a credibility assessment of the testimony of Smith in this case.

¶ 46    Equally important and relevant here, the Illinois Supreme Court has indicated that " '[i]f a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of [the Adoption] Act, "failure to make reasonable progress toward the return of the child to the parent" includes *** the parent's failure to *** fulfill *** her obligations under the service plan and correct the conditions that brought the child into care.' " *In re C.N.*, 196 Ill. 2d at 217 (quoting 750 ILCS 50/1(D)(m) (West Supp. 1999)). Put differently,

    "[when] compliance with DCFS service plans is [intertwined with] a parent's progress toward the return of the child, so much so, that where a service plan has been established

15

to correct the conditions that were the basis for the removal of the child from the parent, the failure to make reasonable progress now includes the failure to *** fulfill the terms of that service plan." *Id.*

¶ 47 Here, the evidence overwhelmingly demonstrates the respondent's failure to make reasonable progress during the alleged nine-month time periods. The evidence at the fitness hearing established that Molly and Callan were removed from the respondent's care in June of 2022, due to concerns of, *inter alia*, domestic violence and substance abuse. Additionally, the evidence established that Caedyn came into care in March of 2023 "due to substance abuse on behalf of the [respondent]." As demonstrated by the background section of this order, the service plan was established to correct the conditions that brought Molly, Callan, and Caedyn into care. The record is replete with examples of the respondent's failure to comply with the terms of the service plan. Additionally, the respondent's own testimony corroborates her noncompliance. During the unfitness hearing, the respondent acknowledged that she was referred for services in August of 2024 and had yet to engage in domestic violence services. More significantly, the respondent admitted to relapsing in March of 2024. Therefore, we cannot say the circuit court's finding of unfitness was against the manifest weight of the evidence, as the opposite conclusion is not clearly evident.

¶ 48 The next issue raised by the respondent is the alleged ineffective assistance from her counsel during the unfitness hearing. A respondent parent's right to counsel in termination proceedings is derived from the Juvenile Court Act. Section 1-5(1) of the Act states:

"[T]he minor who is the subject of the proceeding and his *** parents *** have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings

16

under this Act are not intended to be adversary in character, the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2020).

¶ 49    Although the right to counsel in proceedings under the Juvenile Court Act lacks constitutional footing, that right is closely interrelated to its constitutional counterpart. *In re Br. M.*, 2021 IL 125969, ¶ 42. Therefore, Illinois courts apply the standard utilized in criminal cases to determine the effectiveness of counsel in juvenile proceedings. *Id.* ¶ 43. Accordingly, our review of ineffective assistance of counsel claims in proceedings under the Act is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.*

¶ 50    In order to succeed on a claim of ineffective assistance of counsel under the two-prong standard set forth in *Strickland*, a defendant "must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland*, 466 U.S. at 687). More specifically, a defendant "must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). Thus, the respondent "must establish both prongs of the *Strickland* test, such that the failure to establish either precludes a finding of ineffective assistance of counsel." *People v. Cherry*, 2016 IL 118728, ¶ 31. Accordingly, it is not necessary to evaluate both prongs of the *Strickland* test if the respondent makes an insufficient showing on one. See *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 19. We review a claim of ineffective assistance of counsel *de novo*. *People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 51    On appeal, the respondent claims that she received ineffective assistance because her counsel did not object to the admissions of the four permanency reports written by Smith on the grounds that the reports contained hearsay. The respondent argues that had "counsel objected to

17

offering the permanency reports as evidence, the Court could have declined to admit the reports on the basis of hearsay." The respondent further argues that the circuit court could not find the respondent unfit "absent reliance on improper hearsay."

¶ 52    However, even if the respondent were correct that the reports were inadmissible hearsay, the admissibility of the permanency reports is not critical to the outcome here. While the circuit court did refer to the permanency reports when it ruled the respondent unfit, its remarks are supported by the respondent's testimony at the unfitness hearing. Specifically, the respondent testified that she was re-referred for services in August of 2024 and had yet to engage in domestic violence services. Equally important, the respondent testified to relapsing in March of 2024.

¶ 53    Furthermore, the circuit court took judicial notice of the permanency orders filed on February 13, 2024, May 14, 2024, September 10, 2024, and November 26, 2024. The circuit court referenced these orders in noting that the respondent had not yet completed a service plan. Each of the orders highlighted the respondent's failure to make reasonable progress, attributing her failure to her inability to complete services. Additionally, the orders from February 13, 2024, May 14, 2024, and November 26, 2024, also attributed the respondent's inability to make reasonable progress to her substance abuse issue.

¶ 54    Equally important, the circuit court indicated that it had considered the testimony presented, along with the permanency orders, adjudicatory orders, and dispositional orders entered in this case, following the evidence presented during the unfitness hearing. It is presumed that a court sitting without a jury has "relied only upon competent evidence in making its determination." (Internal quotation marks omitted.) *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 37. The respondent has not pointed to any evidence that would overcome that presumption.

18

¶ 55 Therefore, the respondent has failed to demonstrate a reasonable probability that, if counsel had objected, the result of the unfitness hearing would have been different. Because the respondent has failed to demonstrate a reasonable probability that, if counsel had objected the result of the unfitness hearing would have been different, she has not met her burden of affirmatively proving the prejudice prong under *Strickland*. Consequently, the respondent's claim of ineffective assistance fails.

¶ 56                                   III. CONCLUSION

¶ 57 Based on the foregoing, we affirm the judgment of the circuit court of Saline County.


¶ 58 Affirmed.